1
2
3
4
5
6
7

8       UNITED STATES DISTRICT COURT

9       EASTERN DISTRICT OF WASHINGTON

10       AT SPOKANE

11

12   PLUMBERS UNION LOCAL NO. 12        )   No.
     PENSION FUND, Individually and on   )
13   Behalf of All Others Similarly Situated,   )   CLASS ACTION COMPLAINT FOR
                                         )   VIOLATIONS OF FEDERAL
14                       Plaintiff,      )   SECURITIES LAWS
                                         )
15                                       )
          vs.                            )
16                                       )
                                         )
17   AMBASSADORS GROUP INC.,             )
     JEFFREY D. THOMAS, CHADWICK         )
18   J. BYRD and MARGARET M.             )
     THOMAS,                             )
19                                       )
                                         )
20                       Defendants.     )
                                         )
21

22

23

24

25

26

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Ambassadors Group Inc. ("Ambassadors Group" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal class action on behalf of purchasers of the common stock of Ambassadors Group between February 8, 2007 and October 23, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

5.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.     Plaintiff Plumbers Union Local No. 12 Pension Fund, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of Ambassadors Group at artificially inflated prices during the Class Period and has been damaged thereby.

7.     Defendant Ambassadors Group is incorporated in Delaware and maintains its headquarters at 1956 Ambassador Way, Spokane, WA 99224-4004.  The Company, an educational company, organizes and promotes international and domestic travel programs for youth, athletes, and professionals.

8.     (a)     Defendant Jeffrey D. Thomas ("Jeff Thomas") is, and was at all relevant times, President and Chief Executive Officer of Ambassadors Group.

(b)     Defendant Chadwick J. Byrd ("Byrd") is, and was at all relevant times, Chief Financial Officer, Principal Accounting Officer and Secretary of Ambassadors Group.

(c)     Defendant Margaret M. Thomas ("Peg Thomas") is, and was at all relevant times, Executive Vice President of Ambassadors Group.  She is also the wife of Defendant Jeff Thomas.

(d)     Defendants Jeff Thomas, Byrd and Peg Thomas are referred to herein as the "Individual Defendants."

9.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Ambassadors Group, were privy to confidential and proprietary information concerning Ambassadors Group, its operations, finances, financial condition and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS     - 2 -
3

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

Ambassadors Group, as discussed in detail below.  Because of their positions with Ambassadors Group, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

10.    The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Ambassadors Group's business.

11.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

12.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ National Market ("NASDAQ") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Ambassadors Group's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Ambassadors Group's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Ambassadors Group's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Ambassadors Group's business, operations and management and the intrinsic value of Ambassadors Group's securities; (ii) enabled Individual Defendants Jeff Thomas and Peg Thomas and other Company insiders to sell 225,620 shares of their personally-held Ambassadors Group common stock for gross proceeds in excess of $7.8 million; and (iii) caused Plaintiff and members of the Class to purchase Ambassadors Group's common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

14.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who

1  purchased the common stock of Ambassadors Group between February 8, 2007 and

2  October 23, 2007, inclusive, and who were damaged thereby (the "Class").  Excluded

3  from the Class are Defendants, the officers and directors of the Company, at all

4  relevant times, members of their immediate families and their legal representatives,

5  heirs, successors or assigns and any entity in which Defendants have or had a

6  controlling interest.

7       15.    The members of the Class are so numerous that joinder of all members is

8  impracticable.  Throughout the Class Period, Ambassadors Group common stock was

9  actively traded on the NASDAQ.  While the exact number of Class members is

10 unknown to Plaintiff at this time and can only be ascertained through appropriate

11 discovery, Plaintiff believes that there are hundreds or thousands of members in the

12 proposed Class.  Record owners and other members of the Class may be identified

13 from records maintained by Ambassadors Group or its transfer agent and may be

14 notified of the pendency of this action by mail, using the form of notice similar to that

15 customarily used in securities class actions.

16      16.    Plaintiff's claims are typical of the claims of the members of the Class as

17 all members of the Class are similarly affected by Defendants' wrongful conduct in

18 violation of federal law complained of herein.

19      17.    Plaintiff will fairly and adequately protect the interests of the members of

20 the Class and has retained counsel competent and experienced in class action and

21 securities litigation.

22      18.    Common questions of law and fact exist as to all members of the Class

23 and predominate over any questions solely affecting individual members of the Class.

24 Among the questions of law and fact common to the Class are:

25           (a)    whether the federal securities laws were violated by Defendants'

26 acts as alleged herein;

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS    - 5 -

6

1     (b)     whether statements made by Defendants to the investing public

2     during the Class Period misrepresented material facts about the business and

3     operations of Ambassadors Group;

4     (c)     whether the price of Ambassadors Group common stock was

5     artificially inflated during the Class Period; and

6     (d)     to what extent the members of the Class have sustained damages

7     and the proper measure of damages.

8     19.     A class action is superior to all other available methods for the fair and

9     efficient adjudication of this controversy since joinder of all members is

10     impracticable.  Furthermore, as the damages suffered by individual Class members

11     may be relatively small, the expense and burden of individual litigation make it

12     impossible for members of the Class to individually redress the wrongs done to them.

13     There will be no difficulty in the management of this action as a class action.

14                              **SUBSTANTIVE ALLEGATIONS**

15     20.     Defendant Ambassadors Group describes itself as a "leading educational

16     travel and online educational research organization that organizes and promotes

17     international and domestic travel programs for students, athletes, and professionals,

18     and provides nearly 8.4 million pages of online content."

19     21.     The Class Period begins on February 8, 2007.  On that date, Ambassadors

20     Group issued a press release announcing its financial results for the fourth quarter and

21     year end of 2006, the period ended December 31, 2006.  For the quarter, the Company

22     reported a net loss of $5.4 million, or $0.26 loss per share.  Defendant Jeff Thomas

23     commented on the results, stating, in pertinent part, as follows:

24          We are pleased with our 2006 financial results. We have continued to
          operate and build a business that offers unique, life-changing and
25          globally beneficial travel programs to motivated and achievement-
          oriented delegates. In 2006, we traveled to 40 countries and had students
26          from 70 countries participate in our domestic programs. This global
          reach enriches the lives of those who experience our programs.

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

At the same time, our operating success has continued to create value for our shareowners.

During the year just ended, we generated $26.7 million in net income and $37.2 million in operating cash flow. We then returned $18.4 million in cash to shareowners through our cash dividend and share buyback programs. Subsequent to year-end, we have already deployed $35.5 million to buy back 6.3% of shares outstanding. The net impact of these capital deployment efforts has resulted in Ambassadors returning $53.9 million to our shareowners since the beginning of 2006.

We will continue to seek opportunities to maximize shareowner returns through capital deployment, as well as continuing to grow our company.

22.    On February 9, 2007, Ambassadors Group held a conference call with analysts and investors to discuss the Company's earnings and operations, among other things. With regard to the Company's outlook for 2007, Defendant Peg Thomas stated, in pertinent part, as follows:

For 2007, we're off to a good start. As of February 1, 2006, we had net enrollments of slightly over 47,800 delegates. On the same date for 2007, we currently have 60,600 delegates enrolled. These are already net of withdrawals to date. We have continued to move forward and make progress on a number of operational fronts.

For a few examples, we have approximately 30% of our delegates will be traveling on new programs in 2007. Our social networking website is up and running for our alumni travelers and they are utilizing it as a place to go to discuss their past and prospective program experiences.

We have continued to increase our travelers to Asia, a growing market, but also a growing American interest in this region for us. We have a new sports festival in Vienna this year that will operate in July of 2007 and we have students participating from over 70 countries on our U.S. program, where the visitors stay on seven prestigious college campuses.

We're looking forward to the challenges and excitement that our growing organization will encounter in 2007. . . .

Defendant Byrd stated, in pertinent part, as follows:

For 2007, we are confident that the 27% increase in enrollments will lead to stronger growth on both the top and bottom line than experienced in 2006. Earnings per share and returns on equity will further benefit from the repurchase of approximately 1.3 million shares of stock early in 2007.

In response to a question regarding the 27% increase in enrollment, Defendant Jeff Thomas stated:

> TERRY O'CONNOR, ANALYST, CEDAR CREEK MANAGEMENT: In fact, this is Terry. But asking this another way, if you look at your ultimate delegates traveled last year versus your February 1, '06 number, you lost about 10% from there in your ultimate count. If you'd do the same kind of number, you still get -- I understand what you're saying. There's timing differences.
>
> But the previous questioner was asking about don't you need to find lots of new delegates just to make 15%. And it's hard to get that answer out of these numbers. It sure seems like you're going to be somewhere between 15% and 27% unless the wheels fall off.
>
> JEFF THOMAS: Terry, we agree with you. It's a stronger 27% year over year than last year. I think that's what you're asking. In terms of last year being comparable with a different time in the campaign, kind of what we see. And there's several different moving parts there. We think it's going to be a strong growth year in 2007 than we had in 2006.

23.    On April 23, 2007, Ambassadors Group issued a press release announcing its financial results for the first quarter of 2007, the period ended March 31, 2007. For the quarter, the Company reported an operating loss of $8.5 million, or $0.25 loss per share. Defendant Jeff Thomas commented on the announcement, stating, in pertinent part, as follows:

> We are pleased to report our first quarter results for 2007. As planned, we are reporting a loss for the quarter of $0.25 per share, as we prepare for our two most significant revenue quarters, the second and third quarters. In the first quarter of 2007, we traveled approximately 3,000 delegates, compared to 1,950 in the first quarter of 2006.
>
> We also continued to deploy capital back to our shareholders. This quarter, we deployed $35.6 million to repurchase 1.3 million shares of our stock. Virtually all of our first quarter stock repurchases were executed at a negotiated price of $27.46 per share. At the same time, our first quarter operating results include increased marketing and development spending as we prepare for and invest in 2008 programs.
>
> At this point in the year, we are working to retain those delegates that have already enrolled in 2007 programs, complete preparations for future program delivery and ensure that our programs continue to be operated in a high quality manner. Thank you for your continued support.

24.    On April 24, 2007, Ambassadors Group held a conference call with analysts and investors to discuss the Company's earnings and operations. With regard to the Company's first quarter results and outlook for the rest of the year, Defendant Jeff Thomas stated, in pertinent part, as follows:

> As many of you know, the first quarter of the year is typically a seasonal loss for our organization, and this year is no exception, as we incurred a $0.25 loss for the quarter just ended. But let me tell you what's different about this quarter compared to the same quarter one year ago.
>
> First, we traveled 3,000 delegates this year compared to 2,000 last year. So far this year, in the first quarter we have purchased just under 1.3 million of our own shares compared to 60,000 one year ago.
>
> We are at our lowest deployable cash point since March of 2002, when we spun off from Ambassadors International. This has allowed us to slim down our balance sheet, continue to drive the return in equity number.
>
> And we have 56,000 delegates enrolled to travel or already traveled compared to roughly 45,000 last year at this time. These numbers position us well for 2007. . . .

Defendant Peg Thomas stated, in pertinent part, as follows:

> As we discussed earlier in the year, the headlines for 2007 are the organic growth of our program, continued introduction of new itineraries, and a stabilization of our withdrawal rate. We are executing upon this plan.
>
> The current enrollments for 2007 including those already traveled to date are 56,400. One year ago, this number was 45,300. These numbers reflect enrollments for all four product lines.
>
> New programs comprise about 30% of our current enrollments for 2007, and we define a new program as one that is less than three years old. We closed 2006 with a withdrawal rate of 32%. We believe 2007 will end the year within this range.
>
> Right now, we have two key areas of operational focus. We have just completed our leadership programs in Washington D.C. as well as preparing for the international departures that begin in five weeks.

Defendant Byrd stated, in pertinent part, as follows:

> For those of you looking to see how this year will play out, our growth pattern is different than in years past.

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS    - 9 -

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

10

First of all, we expect a higher weighting of delegates to travel with us in the third quarter than in the second quarter. This means that 60% of our projected growth will take place in the second half of the year.

Second, our expense base is increasing more than in years past and being incurred earlier. For 2007, you will see a larger percent of expenses being incurred in the first half of the year.

Overall, we are confident that the 25% increase in enrollments and increased participant deposits will lead to stronger growth on both the top and bottom line than experienced in 2006.

Earnings per share and returns on equity will further benefit from the $35.6 million repurchase of 1.3 million shares of stock earlier in 2007. Thank you for your time today. I will now turn the call back to Jeff.

In response to a question about marketing expenses, Defendants Byrd and Jeff Thomas stated:

NICK ANDERSON: Good morning. My first question is, it looks like selling and marketing expenses have increased roughly $500,000 sequentially from December to March -- whereas, they typically decline sequentially by $1.5 million. I was hoping you could explain the change.

CHADWICK BYRD: Yes, this year we've -- we're bringing in some selling and marketing programs, not only for 2008, but also for 2007. So the largest increase that you see there is primarily for the 2007 programs.

*     *     *     *

GERRY HEFFERNAN, ANALYST, LORD ABBETT AND COMPANY: Hello, thank you. Sorry for being repetitive here, but as the first person had an interesting question about the expenses increasing from the fourth quarter sequentially and I have to be honest. I really did not fully understand your answer, if you could just review that again.

CHADWICK BYRD: Sure, so in 2007 we incurred some program costs that normally would have been incurred in the previous quarter, but we took those into 2007. We're trying to decrease the amount in which - the time period in which we incur expenses and then receive those revenues.

So for 2007, that is what you are seeing in the first quarter.

GERRY HEFFERNAN: So you're saying the fourth quarter actually was lower than it would have been per the way you were doing business in previous years.

JEFF THOMAS: That is one way to look at it, yes.

25.    On July 23, 2007, Ambassadors Group issued a press release announcing its financial results for the second quarter of 2007, the period ended June 30, 2007. For the quarter, the Company reported net income of $20.9 million, or $1.05 fully diluted earnings per share.  Defendant Jeff Thomas commented on the announcement, stating, in pertinent part, as follows:

> We are pleased to report results for this quarter that continue to keep us on track for our long term financial and operational targets. For the second quarter of 2007, we have traveled 22,380 delegates, compared to 19,200 delegates in the same quarter one year ago. This increase in our delegate count led to a 22 percent increase in our net revenue, from $35.2 to $42.9 million. This top line growth has enabled us to realize a 22 percent increase in our earnings per share for the second quarter, from $0.86 to $1.05. Operationally, we continue to develop and implement unique programs that consistently score very highly on our postprogram evaluation surveys.

> Once again, we were challenged by geopolitical events. This time, we had to contend with the foiled plots in the United Kingdom, which, although highly publicized, had a negligible impact on peoples' decisions to travel with us.  We did activate our response team and communicate to families, teachers and students about what was happening and what we were doing about it. This is a standard part of our operations at this point.

> After deploying $40.1 million of capital back to our shareowners in the form of share buybacks and dividends in the first six months of 2007, our balance sheet has continued to strengthen. We continue to be debt free and have $33.7 million in deployable cash.

26.    On July 24, 2007, Ambassadors Group held a conference call with analysts and investors to discuss the Company's earnings and operations. With regard to the Company's second quarter results and its outlook for the remainder of the year, Defendant Jeff Thomas stated, in pertinent part, as follows:

> And for the second quarter we're pleased to report that we have traveled approximately 25,400 delegates in the first six months of 2007 compared to 21,100 over the first six months of 2006.

> Earnings after tax were nearly $21 million in the second quarter compared to $18.5 million for the same quarter one year ago. After reaching the low point in our balance sheet last quarter, we are rebuilding our strength in this area with over $37 million in deployable cash.

As many of you know, we have a high degree of seasonality in our operations. The seasonality is driven by a couple of things. First, we recognize revenue when our delegates actually travel and the vast majority of our delegates travel in the second and third quarters, so we recognize the majority of our revenue over the second and third quarters. In addition, our operating expenses have seasonality as well due to marketing campaigns that occur in different parts of the year. At this point in time, in fact, nearly all of our marketing spending is for programs that depart in 2008, with spending occurring now to accommodate that growth. As a result, the first and fourth quarters are loss quarters. The second and third quarters are the highest revenue, highest earnings quarters.

Along with this seasonality, our key operating ratios will fluctuate, such as gross margin and operating margins although we are on track to realize our planned numbers along both these dimensions this year. Based on these factors, I want to highlight three things that are different about our second quarter at this point. First, we still have over 27,000 delegates enrolled, but not yet traveled for the rest of 2007. We have students from over 100 countries participating in our programs and there was another foiled terrorist plot in London, much like last summer, although at this point the impact on our operations and enrollments is minimal.

So far we're still on track against plan at this point in terms of delegates to travel as well as key operating ratios. These numbers position us well for the remainder of 2007. . . .

Defendant Peg Thomas stated, in pertinent part, as follows:

We are reporting record numbers for the quarter. This quarter we traveled 22,400 delegates in comparison to 19,200 one year ago in the same period. ***Our second focus this time of year is our marketing campaigns for 2008. We are in the process of launching these campaigns right now. The campaigns are similar in timing and delivery as previous years.***

And that brings us to the remainder of the year. In terms of enrollments for the entire year of 2007, we currently have net enrollments of 53,300 for 2007. This number one year ago was 43,500. These numbers include those delegates that have already traveled year-to-date. So of the 53,300 we have already traveled 25,382, which we have 27,900 remaining to travel in this calendar year. That's if we do not have any more withdrawals off that number. [Emphasis added.]

In response to a question about withdrawals, Defendant Peg Thomas stated:

GREG MCKINLEY: Okay. And so you shared with us some numbers on your net enrollments, I think you said 53,300 as opposed to 43,500 at the same point in time last year, which would imply another just shy of maybe 27,900 yet to travel. I noticed, I guess, based on that 43,500 last year, we ended up travelling 43,100. Should we expect some withdrawal

1   rates in that 300 to 400 student range in the back half to get us to where
    our annual number will be? Or what are your expectations around what
2   you're seeing with withdrawal rate trends and expected travelers for the
    full year?
3
    PEG THOMAS: We're expecting about that same trend, Greg. So it's
4   similar to how you laid it out, that's about where we are too. We'll have
    some more enrollments come in this year, but mostly we'll see -- we'll
5   start to see it change where we get net withdrawals this time of year. So
    that 27,900, obviously, we'd love to travel every one of them, but we
6   will have some withdrawals in that number.

7                          *        *        *        *

8   ERIC WOODWORTH, ANALYST, DSM: Hi, good morning. Thanks
    for the time today. Just a couple of questions here. Kind of related to the
9   attrition rates, it sounds like the attrition rates have kind of stabilized
    relative to Q1 and kind of the second half of '06. Is that fair to say? Or
10  have they continued to --?

11  PEG THOMAS: By attrition rate, you mean withdrawal rate?

12  ERIC WOODWORTH: Yes, yes.

13  PEG THOMAS: Yes. So year-over-year, they have stabilized in terms of
    -- I think we closed the year, 2006, at around 32% and we think we'll
14  end up at about that at the end of 2007.

15  In response to a question regarding the Company's mail campaigns, Defendants Byrd

16  and Peg Thomas stated, in pertinent part, as follows:

17  GREG MCKINLEY: Okay. The headquarters relocation, I know you're
    making some investments there, I believe around direct marketing
18  production, bringing that in-house. Can you talk a little bit about that and
    what type of cost savings or efficiency pay-backs you expect to earn
19  from that?

20  CHADWICK BYRD: Yes, I mean we're -- probably won't get into the
    minutia of the detail on that, but certainly we did invest in some
21  equipment that allows us to in-source our mail campaigns. That
    investment, obviously, we wouldn't have done if we didn't think it was
22  going to pay off. And we are seeing that.

23  The equipment is up and functioning and doing quite well with the kick-
    off of our 2008 programs now. So we're excited about that investment
24  and what it's going to return to the organization.

25  PEG THOMAS: And, Greg, I'll add to that. Partly by doing it, obviously
    it was a long-term investment, but it's also a quality investment for us
26  because as you get larger and you have to have so many more mailings,
    and fulfillment mailings after students and families become part of our

delegations, that quality was really important to us and we wanted to control a lot of that.

In response to questions regarding the Company's outlook, Defendant Byrd stated:

MIMI NOEL, ANALYST, SIDOTI AND COMPANY: Hi. Chadwick, I think I just have two for you. Would you please repeat that gross margin guidance? It sounded a little confusing to me.

CHADWICK BYRD: All right. So gross margin as a percent of our program receipts is expected to be consistent with what we had in 2006, which was just over 35%. And also consistent with this quarter's gross margin percent, which is just over 35%.

*      *      *      *

MIMI NOEL: Okay. And the top-line growth that you provided was, and the bottom line growth, was better than where you were last year? As far as growth rates go? Is that correct?

CHADWICK BYRD: That's correct, but I also said that 45% of our earnings came, last year, came in the second, in the second half. And we expect that to be higher in the second half for 2007.

*      *      *      *

GREG MCKINLEY: Hey guys, I just wanted to make sure I understood some of your guidance comments regarding your outlook for 46% to 49% of fiscal year earnings to occur in the second half of the year. That -- if I just do the numbers right that seems to me like you've essentially taken down your earnings growth guidance for the year. I know that earnings grew roughly 18% or 19% in '07.

But if we take the $16 million of net income you've earned to date and apply, I guess, what would be 51% to 54% you're indicating, as it would represent of the fiscal year, we start getting to maybe like a range of $29.5 to $31.5 million of net income, which is definitely below that 18% or 19% growth range that was generated last year. And I think your prior comments were that earnings growth this year would exceed earnings growth last year. Can you just help me understand how to interpret that?

CHADWICK BYRD: Yes, so I think we're obviously maybe splitting hairs on this one, but on our -- if you look at our earnings per share, we were also at 19%. We expect it to be higher than this year. A lot of that's coming through the repurchase of shares from Invemed so that had a -- is having a decreasing impact on our net income, but it's increasing impact on earnings per share.

GREG MCKINLEY: Okay. So -- okay. Are you -- so you are expecting, in terms of operating earnings then. I don't know, I just sense that I didn't -- wasn't sure that that was the context that that guidance was

originally made in the first half. I thought it was not only in terms of EPS, but also in terms of net income. Is that --?

CHADWICK BYRD: Yes, that's correct.

GREG MCKINLEY: So you have somewhat moderated the second half outlook for operating earnings growth?

CHADWICK BYRD: I think it's been moderated a bit, yes, yes, yes.

GREG MCKINLEY: And is that largely just due to the marketing initiatives or -- I mean, because it seems like the flow through on the top line is remaining quite healthy.

CHADWICK BYRD: No, that's correct.

27.    In response to the earnings announcement and the subsequent conference call, shares of the Company's stock rose $3.08 per share, or approximately 10%, over the next two trading days – to close at $35.19 per share on July 25, 2007.

28.    The statements referenced above in ¶¶21-26 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)    that the Company was experiencing a lower conversion rate from people attending its informational meetings to booking travel;

(b)    that there was a decrease in the number of enrolled participants for the Company's 2008 travel programs, especially in its international outbound programs;

(c)    that the Company had utilized a different database in order to promote its travel programs to prospective clients; and

(d)    as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its prospects.

29.    Then, on October 22, 2007, Ambassadors Group issued a press release announcing its financial results for the third quarter of 2007, the period ending

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS    - 15 -

September 30, 2007.  For the quarter, the Company reported net income of $22.5 million and $1.12 fully diluted earnings per share.  The Company also announced that "as of October 16, 2007, its net enrolled participants for 2008 travel programs were 26,200 compared to 37,300 participants as of the same date last year for its 2007 programs" and that the "decrease in net enrollments for its 2008 programs will negatively impact its 2008 earnings."  Defendant Thomas commented on the results, stating, in pertinent part, as follows:

> The global challenges we met in the past travel seasons, however, have been replaced with current economic challenges. The dollar continues to weaken against most major currencies while fuel prices and airline fuel surcharges continue to hit all-time highs. These inflationary pressures on future program costs, combined with the under-performance of one of our name sources and the current economic uncertainty, creates a challenging environment in which to market our programs. We anticipate that we will not achieve the same earnings in 2008 as in 2007; however, the 2008 enrollments and projections are new and based upon developing information. We are taking measures to mitigate these negative effects.

30.     On October 23, 2007, Ambassadors Group held a conference call with analysts and investors.  With regard to the Company's outlook for 2008, Defendant Jeff Thomas stated, in pertinent part, as follows:

> Third, I want to discuss the outlook for 2008. As many of you know, our marketing for travel in 2008 ramps up considerably after Labor Day. We start to get our first early indicators for next year in late September and early October based upon the results from our information meetings and resulting enrollments.
>
> This is my 13th Fall here and our early indicators for revenue growth in 2008 are not good. In fact, this is only the second time in these 13 Falls that I have been looking at a year-over-year revenue decline. The other was 2001, in the wake of 9/11. The situation is reflected in our balance sheet, where participants' deposits are down approximately 27%. In addition, net enrollments for next year are at roughly 25,800 compared to roughly 36,000 at the same time last year.
>
> These numbers will, of course, impact our revenue results for 2008, although it is too early to provide meaningful guidance. We can, however, make the following statements. We will have less revenue in 2008 than 2007. Although at this point in time, we cannot give a precise number or range. To the extent that our revenue is down in 2008, net income will likely be down even more as our operating leverage will be working against us. Again, we cannot give a precise number or range, it

is too early to tell. To better exemplify what I am talking about, for example, if our sales end up being down 15%, our net income will be down more than 15%.

\*     \*     \*     \*

We are researching and analyzing the drivers of this decline. Right now, we believe the following -- there are a number of external factors working against the people deciding to enroll their children in travel programs that cost over $5,000, including -- the weak U.S. dollar is adding to the cost of the program. The high cost of oil fuel is adding to the cost of airline tickets. In fact, in many cases, the same program year-over-year has seen tuition increase by more than 10%, putting many of our programs in the $6,000 range.

In addition, the wealth effect, whereby a key discretionary spending is driven by the value of peoples' homes is having an adverse impact on people considering buying our programs. And this is the first time in years that many people have seen the value of their homes stagnate or decline.

We also believe that part of the decline is driven by an unexpected decline in the performance of one of our named databases or sources of names. We are disciplined about testing elements of our direct marketing campaign before rolling them out on a national scale. So this database was tested prior to this fall and performed considerably better in the test than in the rollout this fall.

Defendant Peg Thomas added:

For the 2008 marketing campaign, Jeff mentioned in his opening that the enrollments to date for 2008 are 26,200 delegates in comparison to 37,300 one year ago on the comparable date. For the 2008 marketing campaigns, our enrollments are down by close to that 30% on a year-over-year comparison.

We believe this decline can be attributed to the higher fuel prices and a weak dollar, and therefore a higher program price than a year ago, a decline in performance of one of our mailing lists, and the weakened U.S. economy.

31.     In response to this announcement, the price of Ambassadors Group common stock fell $17.73 per share, or approximately 44%, to close at $21.04 per share, on unusually heavy trading volume.

32.     The market for Ambassadors Group common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Ambassadors Group common stock

1  traded at artificially inflated prices during the Class Period.  Plaintiff and other

2  members of the Class purchased or otherwise acquired Ambassadors Group common

3  stock relying upon the integrity of the market price of Ambassadors Group common

4  stock and market information relating to Ambassadors Group, and have been damaged

5  thereby.

6      33.    During the Class Period, Defendants materially misled the investing

7  public, thereby inflating the price of Ambassadors Group's common stock, by

8  publicly issuing false and misleading statements and omitting to disclose material

9  facts necessary to make Defendants' statements, as set forth herein, not false and

10  misleading.  Said statements and omissions were materially false and misleading in

11  that they failed to disclose material adverse information and misrepresented the truth

12  about the Company, its business and operations, as alleged herein.

13      34.    At all relevant times, the material misrepresentations and omissions

14  particularized in this Complaint directly or proximately caused, or were a substantial

15  contributing cause of, the damages sustained by Plaintiff and other members of the

16  Class.  As described herein, during the Class Period, Defendants made or caused to be

17  made a series of materially false or misleading statements about Ambassadors

18  Group's business, prospects and operations.  These material misstatements and

19  omissions had the cause and effect of creating in the market an unrealistically positive

20  assessment of Ambassadors Group and its business, prospects and operations, thus

21  causing the Company's common stock to be overvalued and artificially inflated at all

22  relevant times.  Defendants' materially false and misleading statements during the

23  Class Period resulted in Plaintiff and other members of the Class purchasing the

24  Company's common stock at artificially inflated prices, thus causing the damages

25  complained of herein.

26

**Additional Scienter Allegations**

35.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Ambassadors Group, their control over, and/or receipt and/or modification of Ambassadors Group's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Ambassadors Group, participated in the fraudulent scheme alleged herein.

36.    Defendants were further motivated to engage in this course of conduct in order to allow Individual Defendants Jeff Thomas and Peg Thomas and other Company insiders to sell 225,620 shares of their personally-held Ambassadors Group common stock for gross proceeds in excess of $7.8 million. The following chart sets forth the insider trading:

| Insider | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| DALE FREY | 5/25/2007 | 12,500 | $33.80 | $422,500 |
|  | 5/25/2007 | 3,838 | $33.50 | $128,573 |
|  |  | 16,338 |  | $551,073 |
|  |  |  |  |  |
| JEFFREY THOMAS | 6/4/2007 | 51,000 | $33.89 | $1,728,390 |
|  | 8/8/2007 | 2,512 | $39.13 | $98,295 |
|  | 8/8/2007 | 2,000 | $39.10 | $78,200 |
|  | 8/8/2007 | 600 | $39.70 | $23,820 |
|  | 8/10/2007 | 100 | $39.09 | $3,909 |
|  | 8/13/2007 | 28,900 | $39.06 | $1,128,834 |
|  |  | 85,112 |  | $3,061,448 |
|  |  |  |  |  |
| MARGARET THOMAS | 5/9/2007 | 13,170 | $33.95 | $447,122 |
|  | 5/22/2007 | 500 | $33.70 | $16,850 |

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

| | | | | |
|---|---|---|---|---|
| | 5/24/2007 | 20,500 | $33.15 | $679,575 |
| | | 34,170 | | $1,143,547 |
| | | | | |
| JOHN UEBERROTH | 2/23/2007 | 6,000 | $30.40 | $182,400 |
| | 2/23/2007 | 1,999 | $30.48 | $60,930 |
| | 2/23/2007 | 1,241 | $30.46 | $37,801 |
| | 2/23/2007 | 359 | $30.41 | $10,917 |
| | 2/23/2007 | 200 | $30.42 | $6,084 |
| | 2/23/2007 | 200 | $30.43 | $6,086 |
| | 2/23/2007 | 1 | $30.51 | $31 |
| | 4/30/2007 | 5,500 | $33.10 | $182,050 |
| | 4/30/2007 | 3,300 | $33.00 | $108,900 |
| | 4/30/2007 | 600 | $33.03 | $19,818 |
| | 4/30/2007 | 500 | $33.02 | $16,510 |
| | 4/30/2007 | 100 | $33.04 | $3,304 |
| | 5/9/2007 | 4,200 | $33.70 | $141,540 |
| | 5/9/2007 | 2,000 | $33.80 | $67,600 |
| | 5/9/2007 | 2,000 | $33.90 | $67,800 |
| | 5/9/2007 | 1,900 | $33.91 | $64,429 |
| | 5/9/2007 | 1,500 | $33.63 | $50,445 |
| | 5/9/2007 | 1,500 | $33.81 | $50,715 |
| | 5/9/2007 | 700 | $33.77 | $23,639 |
| | 5/9/2007 | 200 | $33.64 | $6,728 |
| | 5/9/2007 | 200 | $33.85 | $6,770 |
| | 5/9/2007 | 200 | $33.89 | $6,778 |
| | 5/9/2007 | 100 | $33.66 | $3,366 |
| | 5/9/2007 | 100 | $33.67 | $3,367 |
| | 5/9/2007 | 100 | $33.71 | $3,371 |
| | 5/9/2007 | 100 | $33.74 | $3,374 |
| | 5/9/2007 | 100 | $33.82 | $3,382 |
| | 5/9/2007 | 100 | $33.92 | $3,392 |
| | 6/14/2007 | 4,600 | $33.20 | $152,720 |
| | 6/14/2007 | 4,484 | $33.10 | $148,420 |
| | 6/14/2007 | 4,100 | $33.27 | $136,407 |
| | 6/14/2007 | 1,708 | $33.04 | $56,432 |
| | 6/14/2007 | 1,597 | $33.07 | $52,813 |
| | 6/14/2007 | 1,592 | $33.08 | $52,663 |
| | 6/14/2007 | 1,300 | $33.25 | $43,225 |
| | 6/14/2007 | 1,100 | $33.21 | $36,531 |
| | 6/14/2007 | 1,019 | $33.01 | $33,637 |
| | 6/14/2007 | 900 | $33.24 | $29,916 |
| | 6/14/2007 | 900 | $33.28 | $29,952 |
| | 6/14/2007 | 800 | $33.09 | $26,472 |
| | 6/14/2007 | 300 | $33.05 | $9,915 |
| | 6/14/2007 | 300 | $33.06 | $9,918 |
| | 6/14/2007 | 100 | $33.02 | $3,302 |
| | 6/14/2007 | 100 | $33.03 | $3,303 |
| | 6/14/2007 | 100 | $33.22 | $3,322 |
| | 8/1/2007 | 4,600 | $38.50 | $177,100 |

| | 8/1/2007 | 400 | $38.52 | $15,408 |
|---|---|---|---|---|
| | 8/1/2007 | 100 | $38.54 | $3,854 |
| | 8/1/2007 | 100 | $38.55 | $3,855 |
| | 8/1/2007 | 100 | $38.57 | $3,857 |
| | 8/1/2007 | 100 | $38.58 | $3,858 |
| | 8/1/2007 | 3,454 | $38.60 | $133,324 |
| | 8/1/2007 | 2,200 | $38.65 | $85,030 |
| | 8/1/2007 | 2,400 | $38.67 | $92,808 |
| | 8/1/2007 | 5,646 | $38.70 | $218,500 |
| | 8/1/2007 | 900 | $38.76 | $34,884 |
| | 8/1/2007 | 2,400 | $38.83 | $93,192 |
| | 8/1/2007 | 2,000 | $38.88 | $77,760 |
| | 8/1/2007 | 600 | $38.89 | $23,334 |
| | 8/1/2007 | 1,700 | $38.90 | $66,130 |
| | 8/1/2007 | 1,300 | $38.91 | $50,583 |
| | 8/1/2007 | 2,000 | $38.93 | $77,860 |
| | | 90,000 | | $3,131,813 |
| | | | | |
| | **Total:** | **225,620** | | **$7,887,880** |

## Loss Causation/Economic Loss

37.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Ambassadors Group common stock and operated as a fraud or deceit on Class Period purchasers of Ambassadors Group common stock by failing to disclose to investors that the Company was experiencing weakness in its travel programs. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Ambassadors Group common stock fell precipitously as the prior artificial inflation came out.   As a result of their purchases of Ambassadors Group common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

38.    By failing to disclose to investors that the Company was experiencing weakness in its travel programs, Defendants presented a misleading picture of Ambassadors Group's business and prospects.  Defendants' false and misleading statements had the intended effect and caused Ambassadors Group common stock to

1  trade at artificially inflated levels throughout the Class Period, reaching as high as

2  $40.99 per share on October 18, 2007.

3      39.    As a direct result of Defendants' disclosure on October 22, 2007, the

4  price of Ambassadors Group common stock fell precipitously, falling by $17.73 per

5  share, or 44%.  This drop removed the inflation from the price of Ambassadors Group

6  common stock, causing real economic loss to investors who had purchased

7  Ambassadors Group common stock during the Class Period.

8      40.    The 44% decline in the price of Ambassadors Group common stock after

9  this disclosure came to light was a direct result of the nature and extent of Defendants'

10 fraud finally being revealed to investors and the market.  The timing and magnitude of

11 the price decline in Ambassadors Group common stock negates any inference that the

12 loss suffered by Plaintiff and the other Class members was caused by changed market

13 conditions, macroeconomic or industry factors or Company-specific facts unrelated to

14 Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by

15 Plaintiff and the other Class members was a direct result of Defendants' fraudulent

16 scheme to artificially inflate the prices of Ambassadors Group common stock and the

17 subsequent significant decline in the value of Ambassadors Group common stock

18 when Defendants' prior misrepresentations and other fraudulent conduct were

19 revealed.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

20

21     41.    At all relevant times, the market for Ambassadors Group's common stock

22 was an efficient market for the following reasons, among others:

23     (a)    Ambassadors Group common stock met the requirements for

24 listing, and was listed and actively traded on the NASDAQ, a highly efficient and

25 automated market;

26

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS    - 22 -

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

23

1          (b)     as a regulated issuer, Ambassadors Group filed periodic public

2    reports with the SEC and the NASDAQ;

3          (c)     Ambassadors Group regularly communicated with public investors

4    via established market communication mechanisms, including through regular

5    disseminations of press releases on the national circuits of major newswire services

6    and through other wide-ranging public disclosures, such as communications with the

7    financial press and other similar reporting services; and

8          (d)     Ambassadors Group was followed by several securities analysts

9    employed by major brokerage firms who wrote reports which were distributed to the

10   sales force and certain customers of their respective brokerage firms.  Each of these

11   reports was publicly available and entered the public marketplace.

12         42.     As a result of the foregoing, the market for Ambassadors Group common

13   stock promptly digested current information regarding Ambassadors Group from all

14   publicly available sources and reflected such information in the prices of the stock.

15   Under these circumstances, all purchasers of Ambassadors Group common stock

16   during the Class Period suffered similar injury through their purchase of Ambassadors

17   Group common stock at artificially inflated prices and a presumption of reliance

18   applies.

19                              **No Safe Harbor**

20         43.     The statutory safe harbor provided for forward-looking statements under

21   certain circumstances does not apply to any of the allegedly false statements pleaded

22   in this complaint.  Many of the specific statements pleaded herein were not identified

23   as "forward-looking statements" when made.  To the extent there were any forward-

24   looking statements, there were no meaningful cautionary statements identifying

25   important factors that could cause actual results to differ materially from those in the

26   purportedly forward-looking statements.  Alternatively, to the extent that the statutory

1   safe harbor does apply to any forward-looking statements pleaded herein, Defendants

2   are liable for those false forward-looking statements because at the time each of those

3   forward-looking statements were made, the particular speaker knew that the particular

4   forward-looking statement was false, and/or the forward-looking statement was

5   authorized and/or approved by an executive officer of Ambassadors Group who knew

6   that those statements were false when made.

### COUNT I

**Violation of Section 10(b) of
the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

10   44.   Plaintiff repeats and realleges each and every allegation contained above

11   as if fully set forth herein.

12   45.   During the Class Period, Defendants disseminated or approved the

13   materially false and misleading statements specified above, which they knew or

14   deliberately disregarded were misleading in that they contained misrepresentations

15   and failed to disclose material facts necessary in order to make the statements made,

16   in light of the circumstances under which they were made, not misleading.

17   46.   Defendants: (a) employed devices, schemes, and artifices to defraud; (b)

18   made untrue statements of material fact and/or omitted to state material facts

19   necessary to make the statements not misleading; and (c) engaged in acts, practices,

20   and a course of business which operated as a fraud and deceit upon the purchasers of

21   the Company's common stock during the Class Period.

22   47.   Plaintiff and the Class have suffered damages in that, in reliance on the

23   integrity of the market, they paid artificially inflated prices for Ambassadors Group

24   common stock.  Plaintiff and the Class would not have purchased Ambassadors Group

25   common stock at the prices they paid, or at all, if they had been aware that the market

26   prices had been artificially and falsely inflated by Defendants' misleading statements.

48.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Ambassadors Group common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

49.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50.     The Individual Defendants acted as controlling persons of Ambassadors Group within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Ambassadors Group, and their ownership of Ambassadors Group stock, the Individual Defendants had the power and authority to cause Ambassadors Group to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

1

**JURY TRIAL DEMANDED**

2      Plaintiff hereby demands a trial by jury.

3

DATED:  July 14, 2009

4

5                                    s/Karl P. Barth

6                                    KARL P. BARTH, WSBA No. 22780
                                     LOVELL MITCHELL & BARTH, LLP
7                                    911 Western AVE, Suite 308
8                                    Seattle, WA 98104
                                     Telephone:  206/432-8330
9                                    206/432-8331 (fax)

10
                                     COUGHLIN STOIA GELLER
11                                     RUDMAN & ROBBINS LLP
12                                   SAMUEL H. RUDMAN
                                     DAVID A. ROSENFELD
13                                   MARIO ALBA, JR.
14                                   58 South Service Road, Suite 200
                                     Melville, NY  11747
15                                   Telephone:  631/367-7100
16                                   631/367-1173 (fax)

17                                   ROBERT M. CHEVERIE &
18                                     ASSOCIATES
                                     GREGORY CAMPORA
19                                   Commerce Center One
20                                   333 E. River Drive, Suite 101
                                     East Hartford, CT  06108
21                                   Telephone:  860/290-9610

22                                   Attorneys for Plaintiff

23

24

25

26