THE HONORABLE JUSTIN L. QUACKENBUSH

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

AT SPOKANE

| | |
|---|---|
| PLUMBERS UNION LOCAL NO. 12 PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>AMBASSADORS GROUP INC., JEFFREY D. THOMAS, CHADWICK J. BYRD and MARGARET M. THOMAS,<br><br>Defendants. | No. CV-09-00214-JLQ<br><br><u>CLASS ACTION</u><br><br>FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS
(CV-09-00214-JLQ)

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included information obtained from confidential witnesses ("CW"), including former Ambassadors Group, Inc. ("Ambassadors Group" or the "Company") employees, a review of the United States Securities and Exchange Commission ("SEC") filings by Ambassadors Group, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal class action on behalf of purchasers of the common stock of Ambassadors Group between February 8, 2007 and October 23, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Defendant Ambassadors Group organizes and promotes international and domestic travel programs for youth, athletes, and professionals.  The Company extensively markets its programs through mailings to students.

3.    Throughout the Class Period, Defendants knew or recklessly disregarded that the Company had lost access to a key mailing list which it had used to solicit students in grades 5th, 6th, 7th and 8th ("Middle School Age Group") – the age group that represented a material portion of the Company's business and which had historically had the highest positive response rate to Ambassadors Group's mailings.  In late 2006, Ambassadors Group was told by the company that had provided it with mailing lists for the Middle School Age Group that it would no longer sell those names to the Company.  In response,

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS    - 1 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

Ambassadors Group purchased mailing lists for the Middle School Age Group from a new company and, in addition, hired additional marketing personnel. The new lists were predominantly to be used during 2007 to solicit enrollment in programs for 2008. The new lists, however, were untested and the Company could not know how the lists would perform. Furthermore, the new personnel and marketing efforts caused the Company's expenses to rise more than investors anticipated. When analysts questioned the unexpected rise in expenses, Defendants concealed that the Company had lost access to its historical supply of Middle School Age Group mailing lists and that it had ramped up its marketing efforts in response.

4.    By July 2007, as detailed herein, Defendants knew that the lists they had purchased from the new list company were not performing well and that, as a result, enrollment in the Company's 2008 programs would substantially decline. Yet, during an earnings conference call, Defendants falsely described the Company's 2008 marketing campaigns as "similar in timing and delivery as previous years." In truth, there had been dramatic marketing changes at the Company and Defendants knew that business in 2008 would decline as a result.

5.    Then, on October 22, 2007, Ambassadors Group issued a press release announcing that there was a "decrease in net enrollments for its 2008 programs" which would "negatively impact its 2008 earnings" and attributed the decrease in material part to a problem with a mailing list. In response to this announcement, the price of Ambassadors Group stock declined 44% from $37.50 per share to $20.86 per share, on extremely heavy volume.

6.    During the Class Period, while in possession of the true facts about the Company and its business, Defendants sold more than $7.8 million of their personally-held Ambassadors Group common stock to the unsuspecting public.

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS   - 2 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

## JURISDICTION AND VENUE

7.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1337 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).   Ambassadors Group maintains its principal place of business in this District and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

10.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, the Internet, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

11.    Lead Plaintiff Plumbers Union Local No. 12 Pension Fund, as set forth in the certification previously filed with the Court and incorporated by reference herein, purchased the common stock of Ambassadors Group during the Class Period and has been damaged thereby.

12.    Defendant Ambassadors Group is incorporated in Delaware and maintains its headquarters at 1956 Ambassador Way, Spokane, WA 99224-4004. The Company, an educational company, organizes and promotes international and domestic travel programs for youth, athletes, and professionals.

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS    - 3 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

13.    (a)    Defendant Jeffrey D. Thomas ("Jeff Thomas") is, and was at all relevant times, President and Chief Executive Officer of Ambassadors Group.

(b)    Defendant Chadwick J. Byrd ("Byrd") was at all relevant times, Chief Financial Officer, Principal Accounting Officer and Secretary of Ambassadors Group.

(c)    Defendant Margaret M. Thomas ("Peg Thomas") is, and was at all relevant times, Executive Vice President of Ambassadors Group.  She is also the wife of Defendant Jeff Thomas.

(d)    Defendants Jeff Thomas, Byrd and Peg Thomas are referred to herein as the "Individual Defendants."

14.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Ambassadors Group, were privy to confidential and proprietary information concerning Ambassadors Group, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Ambassadors Group, as discussed in detail below. Because of their positions with Ambassadors Group, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS    - 4 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

15.    The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Ambassadors Group's business.

16.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

17.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ (the National Association of Securities Dealers Automated Quotation System) national market and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Ambassadors Group's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS    - 5 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

market price of Ambassadors Group's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

18.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Ambassadors Group's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Ambassadors Group's business, operations and management and the intrinsic value of Ambassadors Group's securities; (ii) enabled the Individual Defendants Jeff Thomas and Peg Thomas and other Company insiders to sell 225,620 shares of their personally held Ambassadors Group common stock for gross proceeds in excess of $7.8 million; and (iii) caused Plaintiff and members of the Class to purchase Ambassadors Group's common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

19.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of purchasers of the common stock of Ambassadors Group during the Class Period who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

20.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ambassadors Group common stock was actively traded on the NASDAQ. While the exact number of

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS    - 6 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

1    Class members is unknown to Plaintiff at this time and can only be ascertained

2    through appropriate discovery, Plaintiff believes that there are hundreds or

3    thousands of members in the proposed Class.  Record owners and other members

4    of the Class may be identified from records maintained by Ambassadors Group or

5    its transfer agent and may be notified of the pendency of this action by mail, using

6    the form of notice similar to that customarily used in securities class actions.

7        21.    Plaintiff's claims are typical of the claims of the members of the Class

8    as all members of the Class are similarly affected by Defendants' wrongful

9    conduct in violation of federal law complained of herein.

10       22.    Plaintiff will fairly and adequately protect the interests of the

11   members of the Class and has retained counsel competent and experienced in class

12   action and securities litigation.

13       23.    Common questions of law and fact exist as to all members of the

14   Class and predominate over any questions solely affecting individual members of

15   the Class.  Among the questions of law and fact common to the Class are:

16           (a)    whether the federal securities laws were violated by

17   Defendants' acts as alleged herein;

18           (b)    whether statements made by Defendants to the investing public

19   during the Class Period misrepresented or omitted material facts about the

20   business, operations and management of Ambassadors Group;

21           (c)    whether the price of Ambassadors Group common stock was

22   artificially inflated during the Class Period; and

23           (d)    to what extent the members of the Class have sustained

24   damages and the proper measure of damages.

25       24.    A class action is superior to all other available methods for the fair

26   and efficient adjudication of this controversy since joinder of all members is

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS     - 7 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## CONFIDENTIAL SOURCES

25.    Plaintiff makes the allegations herein, except as to allegations specifically pertaining to Plaintiff and its counsel, based upon the investigation undertaken by Lead Plaintiff's counsel, which investigation included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about Ambassadors Group, interviews of former employees of Ambassadors Group, press releases and other public statements issued by the Company, and media reports about the Company and believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

26.    Moreover, the allegations made herein are supported by the first-hand knowledge of eight (8) confidential witnesses ("CWs").  These informants include former employees of Ambassadors Group, each of whom were employed during the Class Period, and an employee of a company that Ambassadors Group purchased its lists from, and provided facts from various departments of the Company.  As detailed below, the CWs each served in positions, which provided them with access to the information they are alleged to possess.

27.    Confidential Witness 1 ("CW1") was employed by Ambassadors Group from 1983 through 1997 as a National Sales Manager.  CW1 left the Company and returned in 2002 as a Sales Team Manager until 2008.  As National Sales Manager, CW1 was primarily responsible for purchasing lists of prospective

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS     - 8 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

1  travelers.  As Sales Team Manager, CW1 managed one of four sales teams which
2  contained seven sales people who traveled around the country giving presentations
3  at the Company's informational meetings.

4      28.    Confidential Witness 2 ("CW2") is a former Program Director for
5  Ambassadors Group/People to People.  CW2 was employed by Ambassadors
6  Group from 1987 through March 2008.  During this period, CW2 traveled around
7  the country and made presentations at the Company's informational meetings.

8      29.    Confidential Witness 3 ("CW3") is a former Senior Program Director.
9  CW3 was employed by Ambassadors Group for 23 years, retiring in March 2009.
10 CW3 managed one of four sales teams who traveled around the country and made
11 presentations at the Company's informational meetings.

12     30.    Confidential Witness 4 ("CW4") was the Vice President of Sales and
13 Marketing for one of Ambassadors Group's third party list providers.  CW4 was
14 employed by this third party provider from 2004 through the summer of 2009.
15 During this period, CW4 handled the accounts of companies such as Ambassadors
16 Group.

17     31.    Confidential Witness 5 ("CW5") is a former Senior Program Director.
18 CW5 was employed by Ambassadors Group for 20 years, retiring in March 2008.
19 CW5 managed one of four sales teams who traveled around the country and made
20 presentations at the Company's informational meetings.

21     32.    Confidential Witness 6 ("CW6") is a former Program Support
22 Specialist.  CW6 was employed by Ambassadors Group from January 2005
23 through March 2008.  During this period, CW6 assisted the Senior Program
24 directors.

25     33.    Confidential Witness 7 ("CW7") is a former Program Manager.  CW7
26 was employed by Ambassadors Group from August 2007 through August 2008.  In

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS    - 9 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

1   the beginning of employment, CW7 observed other program directors and
2   managers when they presented at the Company's informational meetings.    In
3   September 2007, CW7 conducted informational meetings independently.

4       34.    Confidential Witness 8 ("CW8") is a former Executive Director of the
5   Citizen Ambassador Program.  CW8 worked at Ambassadors Group for 22 years
6   until August 2009.

## SUBSTANTIVE ALLEGATIONS

7
### The Company and Its Business
8

9       35.    Defendant Ambassadors Group describes itself as a "leading
10  educational travel and online educational research organization that organizes and
11  promotes international and domestic travel programs for students, athletes, and
12  professionals, and provides nearly 8.4 million pages of online content."    The
13  Company's principal source of revenue is selling "study abroad" travel programs
14  to students in grade school and high school.

15      36.    According to its website, Ambassadors Group offers four programs
16  through its People To People travel group: (i) Student Ambassador Programs, also
17  known as the Summer Program, which focuses on "international educational
18  opportunities for students in grades 5-12"; (ii) Sports Ambassador Programs; (iii)
19  Leadership Programs, also known as the Spring Break Program, which
20  concentrates on "leadership development and college preparation opportunities for
21  students in grades 5-12"; and (iv) Citizen Ambassador Programs, which focuses on
22  "opportunities for adults in a wide range of occupations to experience personal and
23  professional growth as they interact with other professionals around the world
24  through seminars, humanitarian efforts, and cultural activities."

25      37.    Ambassadors Group mails millions of marketing letters a year to
26  students and their families touting the Company's People To People travel

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS  - 10 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

programs.  More than 90% of the names that the Company mails its marketing letters to are purchased from third party name source database companies. According to CW 1, who was employed at Ambassadors Group throughout the Class Period as a Sales Team Manager and was responsible for supervising sales people, Ambassadors Group purchased over 90% of the names that the Company mailed solicitations to from third party sources.

38.    The Company has several sales teams.  These sales teams are headed by a Senior Program Director who leads a team of sales people who travel around the country giving presentations at the Company's informational meetings.  Each Senior Program Director has a Program Director under him.  Each Program Director has a Program Manager reporting to them and each team has two assistants based in Spokane, Washington.

39.    The Company begins preparing for its Sports and Spring Break programs by doing its mailings in December.  Unlike the Summer Program, Ambassadors Group partners with many youth sports organizations and obtains the names for the Sports Program from those organizations.  Then, starting in January and finishing in March, the Company's sales teams conduct informational meetings with potential clients.  The Spring Break program is marketed entirely through the mail, with no informational meetings.

40.    In April, all of the Senior Program Directors, along with Jeff and Peg Thomas, among others, meet in Spokane, Washington.  Jeff and Peg Thomas open the meetings with Jeff Thomas announcing the Company's sales projections based on the Company's internal statistics.  The Senior Program Directors are then given hundreds of thousand of names to target potential travelers and their families for the Summer Program.  More than 90% of the names are purchased from third party name source database companies.  The remaining names are given to Ambassadors

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS   - 11 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

Group through referrals, teachers and alumni. The Company uses the April meeting to organize its marketing program for the rest of the year. Moreover, the Company begins to draft the marketing letters that will eventually be mailed to the students and their families. Lastly, following the April meeting, Ambassadors Group mails test letters to certain regions of the country.

41.    During the summer months, the program directors assist the students and families and help them prepare for the current Summer Program. These students would have signed up for the Summer Program in the previous fall. The program directors then travel with some of the groups to monitor their progress. By July, the program directors are back from conducting observational traveling with the students, and are preparing to send out mailings for the next year's Summer Program.

42.    By late August, the Company mails the majority of its marketing letters to students and their families. The marketing letters invite the students and their families to attend informational meetings, as early as September, for the next year's Summer Program. Starting in September and finishing in November, the Company's sales teams conduct informational meetings with potential travelers.

**Ambassadors Group Loses Access**
**To Its Traditional Source of Mailing Lists For the Middle School Age Group**

43.    Unbeknownst to investors, months before the start of the Class Period, Ambassadors Group lost access to its source of mailing lists for the Middle School Age Group. The Company had traditionally purchased lists of names for the Middle School Age Group from the same list company (hereinafter referred to as "List Company A"). The name of List Company A is known to Plaintiff but has not been pled herein in order to protect the confidentiality of this information as Ambassadors Group has repeatedly stated that the identities of its name sources is

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS    - 12 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

an important competitive secret.  In December 2006, List Company A advised Ambassadors Group that it would no longer be selling Ambassadors Group names for the Middle School Age Group.  According to CW4, who was employed at List Company A throughout the Class Period as a Vice President of Sales and Marketing, List Company A stopped selling names of students under the age of 14.

44.    Historically, the Middle School Age Group has produced a significant portion of the Company's revenues and earnings as this age group has historically responded positively to the Company's program mailings.  According to CW1, the loss of the younger student names was critical because those students had better response rates, better attendance rates at the informational meetings and better enrollment rates than the older students, *i.e.*, high school students, even though the younger names represented approximately 25% of the total mailings.  Out of 10,000 mailings to the younger students, roughly 80 students would enroll and travel, while roughly only 27 students would enroll and travel out of 10,000 mailings to high school students.  Aside from the loss of revenue, the loss of this source of names was a significant adverse development for the Company and its business for several reasons.

45.    CW1 confirms that Ambassadors Group lost access to its source of mailing lists for the Middle School Age Group in late 2006.  In addition, after learning that the younger student names would not be available, Ambassadors Group lowered the income level requirements for the names it would mail solicitations to.

46.    First, the Company would have to find a new name source to compensate for the loss of the Middle School Age Group names.  The performance of the lists obtained from any new source would necessarily be unknown and subject to significant risk.  CW1 also stated that Ambassadors Group tracked and

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS
CV-09-00214-JLQ

- 13 -

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

analyzed numerous metrics associated with its mailing programs, including the numbers of names obtained from each source, the income levels of the various regions that letters were sent to and the age group each letter was going to. Income information by zip code was obtained from Census Bureau Block Data Group Databases. By relying on its historical data and modeling, Defendants were able to project the number of travelers and revenue even before the letters were mailed.

47.    Second, the Company would experience increased costs in obtaining a new source of lists. According to CW1, Ambassadors Group also hired a Ms. Finnley in late 2006 or early 2007 to work on finding additional name sources. CW3 confirmed that the Company hired Ms. Finnley to identify new name sources.

48.    Lastly, the loss of the Middle School Age Group names would lead to a loss of future business. Under the agreements that Ambassadors Group has with its list providers, once a student responds in any way to a mailing, the Company owns that name for future mailings and does not have to pay the list company again. Accordingly, the loss of the mailing list from List Company A meant that the Company was losing a source of future repeat customers.

49.    In response to List Company A's refusal to provide names of the Middle School Age Group, Ambassadors Group obtained a mailing list from another list company (hereinafter referred to as "List Company B"). The name of List Company B is known to Plaintiff but has not been pled herein in order to protect the confidentiality of this information. CW1 confirms that as a result of the loss of the younger student names, Ambassadors Group tried to compensate by relying on a new name source that was inadequately tested.

50.    In April 2007, after the names were received from List Company B, Ambassadors Group held a series of meetings attended by the executives including

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS  - 14 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

the Individual Defendants to analyze the name information and organize the mailing program for the next year's summer travel program.    By April, Ambassadors Group knew how many letters were being sent to the various age groups and geographic locations, together with income levels for those locations.

51.    Ambassadors Group began its 2008 mailing program for the following year's program in June 2007, and responses would typically come in within the next 5 to 7 days.  The responses were entered into Ambassadors Group's computer modeling program and by the time of the quarterly earnings conference call in July 2007, referenced in paragraph 69 below, based on the preliminary results and Ambassadors Group's modeling abilities, Ambassadors Group would have been aware of the decline in enrollments for 2008.  CW1 also explained that because the first informational meetings with the students and their parents were scheduled approximately six weeks later, Ambassadors Group would necessarily have obtained a substantial amount of response data by the date of the July 24, 2007 conference call.

52.    Throughout this time, Ambassadors Group maintained a database called the SP or Student Program database in which each name and the associated data (including student age, name source and response or enrollment status) was tracked and from which Student Program reports could be printed.  Executives and sales people had access to the database and it was used by the senior executives including Jeffrey Thomas on an ongoing basis to track and analyze Ambassadors Group's marketing efforts.

53.    CW1 was told by co-workers that, prior to the July 2007 quarterly conference call, a new names list from List Company B was not performing and that numerous meetings were held to discuss the problem with the poor performance of the new List Company B names list in obtaining student responses.

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS    - 15 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

54.    CW1 also confirms being told that Ambassadors Group employees were told not to exercise their stock options, despite the fact that the defendant executives exercised theirs.

55.    CW2 was employed at Ambassadors Group throughout the Class Period as a Program Director.    CW2 confirms the following.    Ambassadors Group's main name source was List Company A.    During 2007, however, Ambassadors Group had a problem obtaining the names of younger students from List Company A for the 2007 mailing program.    The younger students were important because they responded at a higher rate than the older students.    Because the younger names were missing, Ambassadors Group also was unable to get sufficient names to mail solicitations to more affluent neighborhoods.    In order to compensate for the loss of the younger students, Ambassadors Group instead sent letters to low income zip codes and to families who were unlikely to be able to afford Ambassadors Group's programs.

56.    CW2 also confirmed that Ambassadors Group employees were told not to exercise their stock options, despite the fact that the defendant executives exercised theirs.

57.    CW3 was employed as a Program Director who managed a sales team throughout the Class Period.    CW3 confirms that there was a severe lack of attendance of 5th, 6th, 7th and 8th grade students at the informational meetings in 2007 and that the younger students were the best responding age group.    CW3 was later told that the younger students were not attending informational meetings in 2007 because Ambassadors Group had been unable to include the younger names in its mailing program.    CW3 was told by a senior executive in 2007 not to exercise stock options and that Ms. Finnley was hired to identify new name

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS    - 16 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

sources.  CW3 confirmed that to compensate for the loss of the better performing younger names, Ambassadors Group mailed to lower income students.

58.    CW5 was employed at Ambassadors Group throughout the Class Period as a Senior Program Director.  CW5 stated that Ambassadors Group lost its access to 5th, 6th, 7th, and 8th grade student names in 2007 and that those younger student names were critical.  CW5 attended the April 2007 planning meetings and stated that Jeffrey Thomas and Peg Thomas also attended and would have been aware of the loss of the younger student names.  CW5 confirmed that to compensate for the loss of the better performing younger names, Ambassadors Group mailed solicitation to lower income students.  CW5 also stated that Defendant Jeffrey Thomas was familiar with the Company's statistics and knew which names performed better than others.

59.    CW6 was employed at Ambassadors Group throughout the Class Period as a Program Support Specialist.  CW6 attended quarterly employee meetings where Ambassadors Group's business was discussed.  CW6 confirms that Ambassadors Group knew the younger students enrolled at a higher rate than the older students.

60.    CW7 was a Program Manager during portions of the Class Period.  CW7 indicated that in response to the need to target lower income students, Ambassadors Group dropped its registration fee from $400 to $95.  CW7 also stated that the younger students were not showing up at the informational meetings.

61.    CW8 was employed at Ambassadors Group throughout the Class Period.  CW8 confirmed that Ambassadors Group's executives, including the named defendants, attended a meeting every Monday morning to discuss, *inter*

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS  - 17 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

*alia*, the prior week's mailings and Ambassadors Group's projections based on the results.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

62.    The Class Period begins on February 8, 2007.    On that date, Ambassadors Group issued a press release announcing its financial results for the fourth quarter and year end of 2006, the period ended December 31, 2006.  For the quarter, the Company reported a net loss of $5.4 million, or $0.26 loss per share. Defendant Jeff Thomas commented on the results, stating, in pertinent part, as follows:

> We are pleased with our 2006 financial results.  We have continued to operate and build a business that offers unique, life-changing and globally beneficial travel programs to motivated and achievement-oriented delegates.  In 2006, we traveled to 40 countries and had students from 70 countries participate in our domestic programs.  This global reach enriches the lives of those who experience our programs.

> At the same time, our operating success has continued to create value for our shareowners.

> During the year just ended, we generated $26.7 million in net income and $37.2 million in operating cash flow.  We then returned $18.4 million in cash to shareowners through our cash dividend and share buyback programs.    Subsequent to year-end, we have already deployed $35.5 million to buy back 6.3% of shares outstanding.  The net impact of these capital deployment efforts has resulted in Ambassadors returning $53.9 million to our shareowners since the beginning of 2006.

> We will continue to seek opportunities to maximize shareowner returns through capital deployment, as well as continuing to grow our company.

63.    On February 9, 2007, Ambassadors Group held a conference call with analysts and investors to discuss the Company's earnings and operations among other things.  With regard to the Company's outlook for 2007, Defendant Peg Thomas stated, in pertinent part, as follows:

> For 2007, we're off to a good start.  As of February 1, 2006, we had net enrollments of slightly over 47,800 delegates.  On the same date

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS - 18 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

for 2007, we currently have 60,600 delegates enrolled. These are already net of withdrawals to date. We have continued to move forward and make progress on a number of operational fronts.

For a few examples, we have approximately 30% of our delegates will be traveling on new programs in 2007. Our social networking website is up and running for our alumni travelers and they are utilizing it as a place to go to discuss their past and prospective program experiences.

We have continued to increase our travelers to Asia, a growing market, but also a growing American interest in this region for us. We have a new sports festival in Vienna this year that will operate in July of 2007 and we have students participating from over 70 countries on our U.S. program, where the visitors stay on seven prestigious college campuses.

We're looking forward to the challenges and excitement that our growing organization will encounter in 2007.

Defendant Byrd stated, in pertinent part, as follows:

For 2007, we are confident that the 27% increase in enrollments will lead to stronger growth on both the top and bottom line than experienced in 2006. Earnings per share and returns on equity will further benefit from the repurchase of approximately 1.3 million shares of stock early in 2007.

In response to a question regarding the 27% increase in enrollment, Defendant Jeff Thomas stated as follows:

TERRY O'CONNOR, ANALYST, CEDAR CREEK MANAGEMENT: In fact, this is Terry. But asking this another way, if you look at your ultimate delegates traveled last year versus your February 1, '06 number, you lost about 10% from there in your ultimate count. If you'd do the same kind of number, you still get – I understand what you're saying. There's timing differences.

But the previous questioner was asking about don't you need to find lots of new delegates just to make 15%. And it's hard to get that answer out of these numbers. It sure seems like you're going to be somewhere between 15% and 27% unless the wheels fall off.

JEFF THOMAS: Terry, we agree with you. It's a stronger 27% year over year than last year. I think that's what you're asking. In terms of last year being comparable with a different time in the campaign, kind of what we see. And there's several different moving parts there. We think it's going to be a strong growth year in 2007 than we had in 2006.

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS   - 19 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

64.    On April 23, 2007, Ambassadors Group issued a press release announcing its financial results for the first quarter of 2007, the period ended March 31, 2007.  For the quarter, the Company reported an operating loss of $8.5 million, or $0.25 loss per share.  Defendant Jeff Thomas commented on the announcement, stating, in pertinent part, as follows:

> We are pleased to report our first quarter results for 2007.  As planned, we are reporting a loss for the quarter of $0.25 per share, as we prepare for our two most significant revenue quarters, the second and third quarters.  In the first quarter of 2007, we traveled approximately 3,000 delegates, compared to 1,950 in the first quarter of 2006.
>
> We also continued to deploy capital back to our shareholders.  This quarter, we deployed $35.6 million to repurchase 1.3 million shares of our stock.  Virtually all of our first quarter stock repurchases were executed at a negotiated price of $27.46 per share.  **At the same time, our first quarter operating results include increased marketing and development spending as we prepare for and invest in 2008 programs.**
>
> At this point in the year, we are working to retain those delegates that have already enrolled in 2007 programs, complete preparations for future program delivery and ensure that our programs continue to be operated in a high quality manner.  Thank you for your continued support.[1]

65.    The statements referenced in ¶¶62-64 were each materially false and misleading because they positively described Ambassadors Group, its business and trends in its business but failed to disclose that the Company had lost access to its key source of mailing lists for the Middle School Age Group.  Therefore, it was materially false and misleading to highlight positive developments in Ambassadors Group's business when at that very time the Company was struggling to deal with the loss of the mailing lists.  In addition, the statement referenced above in ¶64 that "our first quarter operating results include increased marketing and development

---

[1]  All emphasis is added unless otherwise noted.

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS    - 20 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

1    spending as we prepare for and invest in 2008 programs" was materially false and

2    misleading as it failed to disclose that expenses were increasing because the

3    Company had lost access to its traditional source of names for the Middle School

4    Age Group and was forced to purchase names of another list company as well as

5    hire an employee to work directly on replacing this source of names.

6           66.    On April 24, 2007, Ambassadors Group held a conference call with

7    analysts and investors to discuss the Company's earnings and operations.   With

8    regard to the Company's first quarter results and outlook for the rest of the year,

9    Defendant Jeff Thomas stated, in pertinent part, as follows:

> As many of you know, the first quarter of the year is typically a
> seasonal loss for our organization, and this year is no exception, as we
> incurred a $0.25 loss for the quarter just ended.  But let me tell you
> what's different about this quarter compared to the same quarter one
> year ago.
>
> First, we traveled 3,000 delegates this year compared to 2,000 last
> year. So far this year, in the first quarter we have purchased just under
> 1.3 million of our own shares compared to 60,000 one year ago.
>
> We are at our lowest deployable cash point since March of 2002,
> when we spun off from Ambassadors International.  This has allowed
> us to slim down our balance sheet, continue to drive the return in
> equity number.
>
> And we have 56,000 delegates enrolled to travel or already traveled
> compared to roughly 45,000 last year at this time.  These numbers
> position us well for 2007. . . .

Defendant Peg Thomas stated, in pertinent part, as follows:

> As we discussed earlier in the year, the headlines for 2007 are the
> organic growth of our program, continued introduction of new
> itineraries, and a stabilization of our withdrawal rate.  We are
> executing upon this plan.
>
> The current enrollments for 2007 including those already traveled to
> date are 56,400.  One year ago, this number was 45,300.  These
> numbers reflect enrollments for all four product lines.
>
> New programs comprise about 30% of our current enrollments for
> 2007, and we define a new program as one that is less than three years
> old.  We closed 2006 with a withdrawal rate of 32%.  We believe
> 2007 will end the year within this range.

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS   - 21 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

Right now, we have two key areas of operational focus. We have just completed our leadership programs in Washington D.C. as well as preparing for the international departures that begin in five weeks.

Defendant Byrd stated, in pertinent part, as follows:

Operating expenses increased $3.5 million or 41% in 2007. This reflects increasing our organizational and technical infrastructure to support the growth in delegates traveling with us, completing marketing efforts for 2007 program, and **initiating marketing efforts for 2008**. . . .

\*       \*       \*

For those of you looking to see how this year will play out, our growth pattern is different than in years past.

First of all, we expect a higher weighting of delegates to travel with us in the third quarter than in the second quarter. This means that 60% of our projected growth will take place in the second half of the year.

Second, our expense base is increasing more than in years past and being incurred earlier. For 2007, you will see a larger percent of expenses being incurred in the first half of the year.

Overall, we are confident that the 25% increase in enrollments and increased participant deposits will lead to stronger growth on both the top and bottom line than experienced in 2006.

Earnings per share and returns on equity will further benefit from the $35.6 million repurchase of 1.3 million shares of stock earlier in 2007. Thank you for your time today. I will now turn the call back to Jeff.

In response to a question about marketing expenses, Defendants Byrd and Jeff Thomas stated as follows:

NICK ANDERSON, ANALYST, DOUGHERTY AND COMPANY: Good morning. My first question is, it looks like selling and marketing expenses have increased roughly $500,000 sequentially from December to March – whereas, they typically decline sequentially by $1.5 million. I was hoping you could explain the change.

CHADWICK BYRD: **Yes,** this year we've – we're bringing in some selling and marketing programs, not only for 2008, but also for 2007. So the largest increase that you see there is primarily for the 2007 programs.

\*       \*       \*

GERRY HEFFERNAN, ANALYST, LORD ABBETT AND COMPANY: Hello, thank you. Sorry for being repetitive here, but as the first person had an interesting question about the expenses increasing from the fourth quarter sequentially and I have to be honest. I really did not fully understand your answer, if you could just review that again.

CHADWICK BYRD: Sure, so in 2007 we incurred some program costs that normally would have been incurred in the previous quarter, but we took those into 2007. We're trying to decrease the amount in which – the time period in which we incur expenses and then receive those revenues.

So for 2007, that is what you are seeing in the first quarter.

GERRY HEFFERNAN: So you're saying the fourth quarter actually was lower than it would have been per the way you were doing business in previous years.

JEFF THOMAS: That is one way to look at it, yes.

67.    The statements during the conference call concerning the rise in expenses were each materially false and misleading because they failed to disclose that expenses were increasing because the Company had lost access to its traditional source of names for the Middle School Age Group and was forced to purchase names of another list company as well as hire an employee to work directly on replacing this source of names, as detailed herein.

68.    On July 23, 2007, Ambassadors Group issued a press release announcing its financial results for the second quarter of 2007, the period ended June 30, 2007. For the quarter, the Company reported net income of $20.9 million, or $1.05 fully diluted earnings per share. Defendant Jeff Thomas commented on the announcement, stating, in pertinent part, as follows:

We are pleased to report results for this quarter that continue to keep us on track for our long term financial and operational targets. For the second quarter of 2007, we have traveled 22,380 delegates, compared to 19,200 delegates in the same quarter one year ago. This increase in our delegate count led to a 22 percent increase in our net revenue, from $35.2 to $42.9 million. This top line growth has enabled us to realize a 22 percent increase in our earnings per share for the second quarter, from $0.86 to $1.05. Operationally, we continue to develop

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS    - 23 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

and implement unique programs that consistently score very highly on our post-program evaluation surveys.

Once again, we were challenged by geopolitical events. This time, we had to contend with the foiled plots in the United Kingdom, which, although highly publicized, had a negligible impact on peoples' decisions to travel with us. We did activate our response team and communicate to families, teachers and students about what was happening and what we were doing about it. This is a standard part of our operations at this point.

After deploying $40.1 million of capital back to our shareowners in the form of share buybacks and dividends in the first six months of 2007, our balance sheet has continued to strengthen. We continue to be debt free and have $33.7 million in deployable cash.

69.    On July 24, 2007, Ambassadors Group held a conference call with analysts and investors to discuss the Company's earnings and operations. With regard to the Company's second quarter results and its outlook for the remainder of the year, Defendant Jeff Thomas stated, in pertinent part, as follows:

And for the second quarter we're pleased to report that we have traveled approximately 25,400 delegates in the first six months of 2007 compared to 21,100 over the first six months of 2006.

Earnings after tax were nearly $21 million in the second quarter compared to $18.5 million for the same quarter one year ago. After reaching the low point in our balance sheet last quarter, we are rebuilding our strength in this area with over $37 million in deployable cash.

As many of you know, we have a high degree of seasonality in our operations. The seasonality is driven by a couple of things. First, we recognize revenue when our delegates actually travel and the vast majority of our delegates travel in the second and third quarters, so we recognize the majority of our revenue over the second and third quarters. In addition, our operating expenses have seasonality as well due to marketing campaigns that occur in different parts of the year. At this point in time, in fact, nearly all of our marketing spending is for programs that depart in 2008, with spending occurring now to accommodate that growth. As a result, the first and fourth quarters are loss quarters. The second and third quarters are the highest revenue, highest earnings quarters.

Along with this seasonality, our key operating ratios will fluctuate, such as gross margin and operating margins although we are on track to realize our planned numbers along both these dimensions this year. Based on these factors, I want to highlight three things that are different about our second quarter at this point. First, we still have

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS  - 24 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

over 27,000 delegates enrolled, but not yet traveled for the rest of 2007. We have students from over 100 countries participating in our programs and there was another foiled terrorist plot in London, much like last summer, although at this point the impact on our operations and enrollments is minimal.

So far we're still on track against plan at this point in terms of delegates to travel as well as key operating ratios. These numbers position us well for the remainder of 2007. . . .

Defendant Peg Thomas stated, in pertinent part, as follows:

We are reporting record numbers for the quarter. This quarter we traveled 22,400 delegates in comparison to 19,200 one year ago in the same period. ***Our second focus this time of year is our marketing campaigns for 2008. We are in the process of launching these campaigns right now. The campaigns are similar in timing and delivery as previous years.***

And that brings us to the remainder of the year. In terms of enrollments for the entire year of 2007, we currently have net enrollments of 53,300 for 2007. This number one year ago was 43,500. These numbers include those delegates that have already traveled year-to-date. So of the 53,300 we have already traveled 25,382, which we have 27,900 remaining to travel in this calendar year. That's if we do not have any more withdrawals off that number.

In response to a question about withdrawals, Defendant Peg Thomas stated as follows:

GREG McKINLEY, ANALYST, DOUGHERTY & COMPANY: Okay. And so you shared with us some numbers on your net enrollments, I think you said 53,300 as opposed to 43,500 at the same point in time last year, which would imply another just shy of maybe 27,900 yet to travel. I noticed, I guess, based on that 43,500 last year, we ended up travelling 43,100. Should we expect some withdrawal rates in that 300 to 400 student range in the back half to get us to where our annual number will be? Or what are your expectations around what you're seeing with withdrawal rate trends and expected travelers for the full year?

PEG THOMAS: We're expecting about that same trend, Greg. So it's similar to how you laid it out, that's about where we are too. We'll have some more enrollments come in this year, but mostly we'll see – we'll start to see it change where we get net withdrawals this time of year. So that 27,900, obviously, we'd love to travel every one of them, but we will have some withdrawals in that number.

\*    \*    \*

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS  - 25 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

1    ERIC WOODWORTH, ANALYST, DSM: Hi, good morning.
     Thanks for the time today. Just a couple of questions here. Kind of
2    related to the attrition rates, it sounds like the attrition rates have kind
     of stabilized relative to Q1 and kind of the second half of '06. Is that
3    fair to say? Or have they continued to –?

4    PEG THOMAS: By attrition rate, you mean withdrawal rate?

5    ERIC WOODWORTH: Yes, yes.

6    PEG THOMAS: Yes. So year-over-year, they have stabilized in
     terms of – I think we closed the year, 2006, at around 32% and we
7    think we'll end up at about that at the end of 2007.

8    In response to a question regarding the Company's mail campaigns, Defendants

9    Byrd and Peg Thomas stated, in pertinent part, as follows:

10   GREG McKINLEY: Okay. The headquarters relocation, I know
     you're making some investments there, I believe around direct
11   marketing production, bringing that in-house. Can you talk a little bit
     about that and what type of cost savings or efficiency pay-backs you
12   expect to earn from that?

13   CHADWICK BYRD: Yes, I mean we're – probably won't get into the
     minutia of the detail on that, but certainly we did invest in some
14   equipment that allows us to in-source our mail campaigns. That
     investment, obviously, we wouldn't have done if we didn't think it
15   was going to pay off. And we are seeing that.

16   The equipment is up and functioning and doing quite well with the
     kick-off of our 2008 programs now. So we're excited about that
17   investment and what it's going to return to the organization.

18   PEG THOMAS: And, Greg, I'll add to that. Partly by doing it,
     obviously it was a long-term investment, but it's also a quality
19   investment for us because as you get larger and you have to have so
     many more mailings, and fulfillment mailings after students and
20   families become part of our delegations, that quality was really
     important to us and we wanted to control a lot of that.

21

22   In response to questions regarding the Company's outlook, Defendant Byrd stated

23   as follows:

     MIMI NOEL, ANALYST, SIDOTI AND COMPANY: Hi.
24   Chadwick, I think I just have two for you. Would you please repeat
     that gross margin guidance? It sounded a little confusing to me.

25   CHADWICK BYRD: All right. So gross margin as a percent of our
26   program receipts is expected to be consistent with what we had in

FIRST AMENDED COMPLAINT FOR                                    Lovell Mitchell & Barth, LLP
VIOLATIONS OF FEDERAL SECURITIES LAWS  - 26 -      911 Western Ave., Suite 308, Seattle, WA 98104
CV-09-00214-JLQ                                       Telephone: 206/432-8330 • Fax: 206/432-8331

2006, which was just over 35%. And also consistent with this quarter's gross margin percent, which is just over 35%.

        *     *     *

MIMI NOEL: Okay. And the top-line growth that you provided was, and the bottom line growth, was better than where you were last year? As far as growth rates go? Is that correct?

CHADWICK BYRD: That's correct, but I also said that 45% of our earnings came, last year, came in the second, in the second half. And we expect that to be higher in the second half for 2007.

        *     *     *

GREG McKINLEY: Hey guys, I just wanted to make sure I understood some of your guidance comments regarding your outlook for 46% to 49% of fiscal year earnings to occur in the second half of the year. That – if I just do the numbers right that seems to me like you've essentially taken down your earnings growth guidance for the year. I know that earnings grew roughly 18% or 19% in '07.

But if we take the $16 million of net income you've earned to date and apply, I guess, what would be 51% to 54% you're indicating, as it would represent of the fiscal year, we start getting to maybe like a range of $29.5 to $31.5 million of net income, which is definitely below that 18% or 19% growth range that was generated last year. And I think your prior comments were that earnings growth this year would exceed earnings growth last year. Can you just help me understand how to interpret that?

CHADWICK BYRD: Yes, so I think we're obviously maybe splitting hairs on this one, but on our – if you look at our earnings per share, we were also at 19%. We expect it to be higher than that this year. A lot of that's coming through the repurchase of shares from Invemed so that had a – is having a decreasing impact on our net income, but it's increasing impact on earnings per share.

GREG McKINLEY: Okay. So – okay. Are you – so you are expecting, in terms of operating earnings then. I don't know, I just sense that I didn't – wasn't sure that that was the context that that guidance was originally made in the first half. I thought it was not only in terms of EPS, but also in terms of net income. Is that –?

CHADWICK BYRD: Yes, that's correct.

GREG McKINLEY: So you have somewhat moderated the second half outlook for operating earnings growth?

CHADWICK BYRD: I think it's been moderated a bit, yes, yes, yes.

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS   - 27 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

GREG McKINLEY: And is that largely just due to the marketing initiatives or – I mean, because it seems like the flow through on the top line is remaining quite healthy.

CHADWICK BYRD: No, that's correct.

\* \* \*

JEFF THOMAS: Thank you for being on the call. We appreciate all of the questions that you asked and we look forward to wrapping up our summer travel season here towards the end of August **and start focusing more heavily on keeping the growth going in 2008**. Thank you.

70. In response to the earnings announcement and the subsequent conference call, shares of the Company's stock rose $3.08 per share, or approximately 10%, over the next two trading days – to close at $35.19 per share on July 25, 2007.

71. The statements referenced above in ¶¶68 and 69 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a) that the marketing program for 2008 was markedly dissimilar in delivery to prior years because the Company had been unable to obtain names for the Middle School Age Group - its most productive demographic group - and as a result, Ambassadors Group was mailing solicitations to less productive older students and students with lower incomes who were far less likely to be able or willing to purchase overseas travel;

(b) that the Company had utilized a different mailing list, which was untested and had not performed well, to compensate for the loss of the key Middle School Age Group names;

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS  - 28 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

1          (c)    that there was a material decrease in the number of enrolled

2    participants for the Company's 2008 travel programs, especially in its international

3    outbound programs;

4          (d)    that the increased operating expenses were due in substantial

5    part to Ambassadors Group's attempts to purchase additional names in order to

6    compensate for the loss of the younger names; and

7          (e)    as a result of the foregoing, Defendants' statements that the

8    marketing program for 2008 would be similar to prior years were materially false

9    and misleading, and Defendants lacked a reasonable basis for their positive

10    statements about the Company and its prospects.

11        72.    Then, on October 22, 2007, Ambassadors Group issued a press release

12    announcing its financial results for the third quarter of 2007, the period ending

13    September 30, 2007.  For the quarter, the Company reported net income of $22.5

14    million and $1.12 fully diluted earnings per share.  The Company also announced

15    that "as of October 16, 2007, its net enrolled participants for 2008 travel programs

16    were 26,200 compared to 37,300 participants as of the same date last year for its

17    2007 programs" and that the "decrease in net enrollments for its 2008 programs

18    will negatively impact its 2008 earnings."  Defendant Jeff Thomas commented on

19    the results, stating, in pertinent part, as follows:

20        The global challenges we met in the past travel seasons, however,
    have been replaced with current economic challenges.  The dollar

21        continues to weaken against most major currencies while fuel prices
    and airline fuel surcharges continue to hit all-time highs.  These

22        inflationary pressures on future program costs, combined with the
    under-performance of one of our name sources and the current

23        economic uncertainty, creates a challenging environment in which to
    market our programs.  We anticipate that we will not achieve the same

24        earnings in 2008 as in 2007; however, the 2008 enrollments and
    projections are new and based upon developing information.  We are

25        taking measures to mitigate these negative effects.

26

FIRST AMENDED COMPLAINT FOR           Lovell Mitchell & Barth, LLP
VIOLATIONS OF FEDERAL SECURITIES LAWS **- 29 -**  911 Western Ave., Suite 308, Seattle, WA 98104
CV-09-00214-JLQ                     Telephone: 206/432-8330 • Fax: 206/432-8331

73.    On October 23, 2007, Ambassadors Group held a conference call with analysts and investors. With regard to the Company's outlook for 2008, Defendant Jeff Thomas stated, in pertinent part, as follows:

> Third, I want to discuss the outlook for 2008. As many of you know, our marketing for travel in 2008 ramps up considerably after Labor Day. We start to get our first early indicators for next year in late September and early October based upon the results from our information meetings and resulting enrollments.
>
> This is my 13th Fall here and our early indicators for revenue growth in 2008 are not good. In fact, this is only the second time in these 13 Falls that I have been looking at a year-over-year revenue decline. The other was 2001, in the wake of 9/11. The situation is reflected in our balance sheet, where participants' deposits are down approximately 27%. In addition, net enrollments for next year are at roughly 25,800 compared to roughly 36,000 at the same time last year.
>
> These numbers will, of course, impact our revenue results for 2008, although it is too early to provide meaningful guidance. We can, however, make the following statements. We will have less revenue in 2008 than 2007. Although at this point in time, we cannot give a precise number or range. To the extent that our revenue is down in 2008, net income will likely be down even more as our operating leverage will be working against us. Again, we cannot give a precise number or range, it is too early to tell. To better exemplify what I am talking about, for example, if our sales end up being down 15%, our net income will be down more than 15%.
>
> *        *        *
>
> We are researching and analyzing the drivers of this decline. Right now, we believe the following – there are a number of external factors working against the people deciding to enroll their children in travel programs that cost over $5,000, including – the weak U.S. dollar is adding to the cost of the program. The high cost of oil fuel is adding to the cost of airline tickets. In fact, in many cases, the same program year-over-year has seen tuition increase by more than 10%, putting many of our programs in the $6,000 range.
>
> In addition, the wealth effect, whereby a key discretionary spending is driven by the value of peoples' homes is having an adverse impact on people considering buying our programs. And this is the first time in years that many people have seen the value of their homes stagnate or decline.
>
> We also believe that part of the decline is driven by an unexpected decline in the performance of one of our named databases or sources of names. We are disciplined about testing elements of our direct

marketing campaign before rolling them out on a national scale. So this database was tested prior to this fall and performed considerably better in the test than in the rollout this fall.

Defendant Peg Thomas added as follows:

For the 2008 marketing campaign, Jeff mentioned in his opening that the enrollments to date for 2008 are 26,200 delegates in comparison to 37,300 one year ago on the comparable date. For the 2008 marketing campaigns, our enrollments are down by close to that 30% on a year-over-year comparison.

We believe this decline can be attributed to the higher fuel prices and a weak dollar, and therefore a higher program price than a year ago, a decline in performance of one of our mailing lists, and the weakened U.S. economy.

74.    In response to this announcement, the price of Ambassadors Group common stock fell $17.73 per share, or approximately 44%, to close at $21.04 per share, on unusually heavy trading volume. Indeed, the statement that Ambassadors Group got its first indicators for next year in late September and early October was false because it actually knew by June and July that letter response rates had declined and indeed by late 2006 that it would not have access to the junior high school names.

75.    On February 7, 2008, Ambassadors Group held a conference call with analysts and investors. During that call, Defendant Jeff Thomas made the following admissions:

During our last call we cited two reasons, a bad mailing list, and a hesitant consumer for our decline in enrollments. And although in many ways the Company has already addressed and is addressing these issues. We've received numerous questions from investors on this subject, so I want to dedicate some time to discussing the challenges we face and how we are addressing them.

As many of your know, we are the only public competitor in the student travel space and for that reason we want to be cautious about the extent of the details that we provide about the marketing of our programs to help protect our competitive advantages. Also, there is not a good deal of market information on our industry, so since our last earnings call I've had the opportunity to speak with several of our competitors.

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS    - 31 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

And although they did not disclose exact figures, they are facing the same challenges that we are – surprisingly high costs of international travel, as well as a reluctant American consumer, and our experiencing sales declines at a variety of price points.  As one example, one competitor described the impact of their international price increases as "chilling."

As mentioned previously, we had a mailing list issue, which our analysis tells us was a larger issue than the economic environment issues we are facing.  For competitive reasons, I will not name the list or its provider as this would be akin to a public service announcement.  Our marketing and sales process involves a number of steps, and the first is built around a response to a program invitation.

It is important to note that we use a variety of sources of names for these programs, literally dozens.  Some sources we have built internally from nominations, recommendations, referrals and past travelers.  Some sources are highly qualified lists of outstanding students.  Some lists are of a more general nature.  At the same time, we use literally thousands of different invitation format letters to contact potential student travelers.

Last fall, which is our most important marketing period, we had one key list perform poorly.  Actually, let's say that this list bombed.  At the same time, our other lists performed basically at expectations, no matter the offer, the source or any other demographic factor.  Of course, the list that underperformed is one of our most important.  Please know that we test our lists and had tested this particular list over the last two years in the fall of '05 and '06.  Still, this list was the most important factor in negative performance this fall.

*    *    *

However, despite the impact of the overall economy on our business, we want to be clear that the issue with the marketing list was much more impactful on our business than the slow-down in the economy.  In other words, without the mailing list we would be seeing application enrollment rates more on a par with what a person might normally expect in this context.

76.    The market for Ambassadors Group common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Ambassadors Group common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Ambassadors Group common stock relying upon the integrity of the market price of Ambassadors

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS    - 32 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

Group common stock and market information relating to Ambassadors Group, and have been damaged thereby.

77.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Ambassadors Group common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

78.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Ambassadors Group's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Ambassadors Group and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

79.   As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS   - 33 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Ambassadors Group, their control over, and/or receipt and/or modification of Ambassadors Group's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Ambassadors Group, participated in the fraudulent scheme alleged herein.

80. Defendants were further motivated to engage in this course of conduct in order to allow Individual Defendants Jeff Thomas and Peg Thomas and other Company insiders to sell 225,620 shares of their personally held Ambassadors Group common stock for gross proceeds in excess of $7.8 million. The following chart sets forth the insider trading which was unusual and suspicious:

| Insider | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| DALE FREY | 5/25/2007 | 12,500 | $33.80 | $422,500 |
| | 5/25/2007 | 3,838 | $33.50 | $128,573 |
| | | 16,338 | | $551,073 |
| | | | | |
| JEFFREY THOMAS | 6/4/2007 | 51,000 | $33.89 | $1,728,390 |
| | 8/8/2007 | 2,512 | $39.13 | $98,295 |
| | 8/8/2007 | 2,000 | $39.10 | $78,200 |
| | 8/8/2007 | 600 | $39.70 | $23,820 |
| | 8/10/2007 | 100 | $39.09 | $3,909 |
| | 8/13/2007 | 28,900 | $39.06 | $1,128,834 |
| | | 85,112 | | $3,061,448 |
| | | | | |
| MARGARET THOMAS | 5/9/2007 | 13,170 | $33.95 | $447,122 |
| | 5/22/2007 | 500 | $33.70 | $16,850 |
| | 5/24/2007 | 20,500 | $33.15 | $679,575 |
| | | 34,170 | | $1,143,547 |
| | | | | |
| JOHN UEBERROTH | 2/23/2007 | 6,000 | $30.40 | $182,400 |
| | 2/23/2007 | 1,999 | $30.48 | $60,930 |
| | 2/23/2007 | 1,241 | $30.46 | $37,801 |

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

| | 2/23/2007 | 359 | $30.41 | $10,917 |
|---|---|---|---|---|
| | 2/23/2007 | 200 | $30.42 | $6,084 |
| | 2/23/2007 | 200 | $30.43 | $6,086 |
| | 2/23/2007 | 1 | $30.51 | $31 |
| | 4/30/2007 | 5,500 | $33.10 | $182,050 |
| | 4/30/2007 | 3,300 | $33.00 | $108,900 |
| | 4/30/2007 | 600 | $33.03 | $19,818 |
| | 4/30/2007 | 500 | $33.02 | $16,510 |
| | 4/30/2007 | 100 | $33.04 | $3,304 |
| | 5/9/2007 | 4,200 | $33.70 | $141,540 |
| | 5/9/2007 | 2,000 | $33.80 | $67,600 |
| | 5/9/2007 | 2,000 | $33.90 | $67,800 |
| | 5/9/2007 | 1,900 | $33.91 | $64,429 |
| | 5/9/2007 | 1,500 | $33.63 | $50,445 |
| | 5/9/2007 | 1,500 | $33.81 | $50,715 |
| | 5/9/2007 | 700 | $33.77 | $23,639 |
| | 5/9/2007 | 200 | $33.64 | $6,728 |
| | 5/9/2007 | 200 | $33.85 | $6,770 |
| | 5/9/2007 | 200 | $33.89 | $6,778 |
| | 5/9/2007 | 100 | $33.66 | $3,366 |
| | 5/9/2007 | 100 | $33.67 | $3,367 |
| | 5/9/2007 | 100 | $33.71 | $3,371 |
| | 5/9/2007 | 100 | $33.74 | $3,374 |
| | 5/9/2007 | 100 | $33.82 | $3,382 |
| | 5/9/2007 | 100 | $33.92 | $3,392 |
| | 6/14/2007 | 4,600 | $33.20 | $152,720 |
| | 6/14/2007 | 4,484 | $33.10 | $148,420 |
| | 6/14/2007 | 4,100 | $33.27 | $136,407 |
| | 6/14/2007 | 1,708 | $33.04 | $56,432 |
| | 6/14/2007 | 1,597 | $33.07 | $52,813 |
| | 6/14/2007 | 1,592 | $33.08 | $52,663 |
| | 6/14/2007 | 1,300 | $33.25 | $43,225 |
| | 6/14/2007 | 1,100 | $33.21 | $36,531 |
| | 6/14/2007 | 1,019 | $33.01 | $33,637 |
| | 6/14/2007 | 900 | $33.24 | $29,916 |
| | 6/14/2007 | 900 | $33.28 | $29,952 |
| | 6/14/2007 | 800 | $33.09 | $26,472 |
| | 6/14/2007 | 300 | $33.05 | $9,915 |
| | 6/14/2007 | 300 | $33.06 | $9,918 |
| | 6/14/2007 | 100 | $33.02 | $3,302 |
| | 6/14/2007 | 100 | $33.03 | $3,303 |
| | 6/14/2007 | 100 | $33.22 | $3,322 |
| | 8/1/2007 | 4,600 | $38.50 | $177,100 |
| | 8/1/2007 | 400 | $38.52 | $15,408 |
| | 8/1/2007 | 100 | $38.54 | $3,854 |
| | 8/1/2007 | 100 | $38.55 | $3,855 |
| | 8/1/2007 | 100 | $38.57 | $3,857 |
| | 8/1/2007 | 100 | $38.58 | $3,858 |
| | 8/1/2007 | 3,454 | $38.60 | $133,324 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS - 35 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

| | | 8/1/2007 | 2,200 | $38.65 | $85,030 |
|---|---|---|---|---|---|
| | | 8/1/2007 | 2,400 | $38.67 | $92,808 |
| | | 8/1/2007 | 5,646 | $38.70 | $218,500 |
| | | 8/1/2007 | 900 | $38.76 | $34,884 |
| | | 8/1/2007 | 2,400 | $38.83 | $93,192 |
| | | 8/1/2007 | 2,000 | $38.88 | $77,760 |
| | | 8/1/2007 | 600 | $38.89 | $23,334 |
| | | 8/1/2007 | 1,700 | $38.90 | $66,130 |
| | | 8/1/2007 | 1,300 | $38.91 | $50,583 |
| | | 8/1/2007 | 2,000 | $38.93 | $77,860 |
| | | | 90,000 | | $3,131,813 |
| | | | | | |
| | | **Total:** | **225,620** | | **$7,887,880** |

## Loss Causation/Economic Loss

81.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Ambassadors Group common stock and operated as a fraud or deceit on Class Period purchasers of Ambassadors Group common stock by failing to disclose the material adverse facts detailed herein.  When these adverse facts became apparent to the market, the price of Ambassadors Group common stock fell precipitously as the prior artificial inflation came out.  As a result of their purchases of Ambassadors Group common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

82.     By failing to disclose the material facts detailed herein, Defendants presented a misleading picture of Ambassadors Group's business and prospects. Defendants' false and misleading statements had the intended effect and caused Ambassadors Group common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $40.99 per share on October 18, 2007.

83.   As a direct result of Defendants' disclosure on October 22, 2007, the price of Ambassadors Group common stock fell precipitously, falling by $17.73 per share, or 44%.  This drop removed the inflation from the price of Ambassadors Group common stock, causing real economic loss to investors who had purchased Ambassadors Group common stock during the Class Period.

84.   The 44% decline in the price of Ambassadors Group common stock after this disclosure came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price decline in Ambassadors Group common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.   The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Ambassadors Group common stock and the subsequent significant decline in the value of Ambassadors Group common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

85.   At all relevant times, the market for Ambassadors Group's common stock was an efficient market for the following reasons, among others:

(a)   Ambassadors Group common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   as a regulated issuer, Ambassadors Group filed periodic public reports with the SEC and the NASDAQ;

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS   - 37 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

(c)    Ambassadors Group regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Ambassadors Group was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

86.    As a result of the foregoing, the market for Ambassadors Group common stock promptly digested current information regarding Ambassadors Group from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Ambassadors Group common stock during the Class Period suffered similar injury through their purchase of Ambassadors Group common stock at artificially inflated prices and a presumption of reliance applies.

### No Safe Harbor

87.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS  - 38 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Ambassadors Group who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

88.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

89.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

90.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

91.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Ambassadors Group common stock.    Plaintiff and the Class would not have purchased Ambassadors Group common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS    - 39 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

92.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Ambassadors Group common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

93.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

94.     The Individual Defendants acted as controlling persons of Ambassadors Group within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By reason of their positions as officers and/or directors of Ambassadors Group, and their ownership of Ambassadors Group stock, the Individual Defendants had the power and authority to cause Ambassadors Group to engage in the wrongful conduct complained of herein.   By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS   - 40 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  January 11, 2010           LOVELL MITCHELL & BARTH, LLP


                                    /s/ Karl P. Barth
                                    Karl P. Barth, WSBA #22780

                                    911 Western Ave., Suite 308
                                    Seattle, WA  98104
                                    Telephone:  206/432-8330
                                    206/432-8331 (fax)

                                    Liaison Counsel

                                    COUGHLIN STOIA GELLER
                                      RUDMAN & ROBBINS LLP
                                    JOHN K. GRANT
                                    100 Pine Street, Suite 2600
                                    San Francisco, CA  94111
                                    Telephone:  415/288-4545
                                    415/288-4534 (fax)

                                    COUGHLIN STOIA GELLER
                                      RUDMAN & ROBBINS LLP
                                    SAMUEL H. RUDMAN
                                    DAVID A. ROSENFELD
                                    MARIO ALBA JR.
                                    58 South Service Road, Suite 200
                                    Melville, NY  11747
                                    Telephone:  631/367-7100
                                    631/367-1173 (fax)

                                    Lead Counsel for Plaintiff

                                    ROBERT M. CHEVERIE &
                                      ASSOCIATES
                                    GREGORY CAMPORA
                                    Commerce Center One
                                    333 E. River Drive, Suite 101
                                    East Hartford, CT  06108
                                    Telephone:  860/290-9610

                                    Additional Counsel for Plaintiff

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS  - 41 -
CV-09-00214-JLQ

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331