UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| PLUMBERS UNION LOCAL NO. 12 PENSION FUND, et al., | NO. CV-09-00214-JLQ |
| Plaintiffs, | **CLASS ACTION** |
| v. | **MEMORANDUM OPINION AND ORDER DENYING MOTIONS TO DISMISS** |
| AMBASSADOR'S GROUP, et al., | |
| Defendants. | |

**BEFORE THE COURT** is the Defendants' Motion to Dismiss the First Amended Complaint (Ct. Rec. 49), to which the Plaintiff has responded in opposition (Ct. Rec. 61) and the Defendants have replied (Ct. Rec. 67). Also before the court is Defendant Chadwick Byrd's separate Motion to Dismiss the First Amended Complaint (Ct. Rec. 55), to which the Plaintiff has responded in opposition (Ct. Rec. 62) and Mr. Byrd has replied (Ct. Rec. 72).

In its First Amended Complaint (Ct. Rec. 45), Plaintiff alleges that during the Class Period of February 8-October 23, 2007, the Defendants wrongfully and artificially inflated the stock price of Ambassador's Group through public statements and omissions and that all stock purchasers during this period suffered resultant damages. Count 1 of the First Amended Complaint alleges violation of Section 10b and Rule 10b-5 of the Exchange Act against all Defendants. Count 2 alleges that the individual Defendants are jointly and severally liable as control persons for each other's Section 10b violations pursuant to Section 20(a) of the Exchange Act.

ORDER - 1

The Plaintiff alleges that numerous statements and omissions made by the Defendants during the Class Period were misleading.  At the heart of the Plaintiff's allegations is the contention that one disclosure, rather than it being omitted, would have prevented all the statements made by Ambassadors from being misleading.  The claimed omission was that Ambassadors  had lost access to its primary Middle School names mailing list, responsible for 45% of its business from its ongoing relationship with List Company A, and was forced to expend resources to acquire an inadequate replacement list from List Company B.  Plaintiff claims the replacement list performed poorly and Ambassadors stock subsequently plummeted.

Defendants[1] put forth three grounds supporting their Motion to Dismiss the First Amended Complaint: failure to state a claim upon which relief may be granted, failure to meet the Private Securities Litigation Reform Act's heightened pleading requirements, and failure to demonstrate a strong inference of scienter.  For the reasons stated herein and in court, the Motions to Dismiss are **DENIED**.

I. Introduction

A.  Factual Background

Defendant Ambassadors Group ("Ambassadors") is a publicly traded student travel company headquartered in Spokane, Washington.  Defendant Jeffery Thomas ("Mr. Thomas") was and currently remains President and CEO of Ambassadors.  Defendant Margaret Thomas ("Mrs. Thomas") was and currently remains Executive Vice President of Ambassadors.  Defendant Chadwick Byrd ("Byrd") was and currently remains Chief Financial Officer of Ambassadors.

The First Amended Complaint alleges that Ambassadors markets its student-travel trips via a two-step process: informational materials are mailed to prospective student-

---

[1]"Defendants" refers to all Defendants except Chadwick Byrd.  Mr. Byrd adopts all arguments made in the Motion of his co-Defendants.  To the extent that Mr. Byrd makes further, individual arguments, these are addressed independently in Sec. III-D, *post*.

ORDER - 2

travelers, and then local informational meetings are held for those students expressing an interest in traveling based on the direct mailings.  Mailing lists purchased from third party list accumulators provide the vast majority of the names to which informational materials are mailed.  Ambassadors purchases 90% of the names to which it sends marketing materials from the accumulator list companies.  These lists are supplemented by Ambassadors with referrals from teachers and former travelers.  Younger students from middle schools and junior high schools generally respond at three times the rate of older high school students.  Travel occurs primarily between June and August in a given year. Marketing for that year commences one year prior thereto, with most of the initial mailings by Ambassadors being sent in late August for travel the following summer.  The first informational meeting for interested students in a given location occurs after Labor Day.

In December 2006, the mailing list company from which Ambassadors purchased its Middle School names list ("List Company A") ended its relationship with Ambassadors for undisclosed reasons. It is this event and its non-disclosure that is at the heart of Plaintiff's claims.  Ambassadors was forced to purchase and utilize a replacement Middle School names list from a different company ("List Company B").  Ambassadors tested the new list before it was utilized in the mailing campaign that began in 2007.

From 2005 to 2006, Ambassadors' revenue grew from $69 to $88 million, with travelers increasing from 37,000 to 43,000.  From 2006 to 2007, revenue grew from $88 to $114 million, with travelers increasing from 43,000 to 52,000.  On October 22, 2007, Ambassadors announced that enrolled participants for 2008 travel totaled 26,200, down from 37,300 enrollees during the comparable prior period in 2007.  Ambassadors articulated its belief that revenues would be negatively impacted by this reduced enrollment, but that the full extent thereof was still being determined and appropriate remedial measures were being taken.  Ambassadors stock price fell 44%, to $17.73 per share, on October 22, 2007.

Throughout 2007, Ambassadors routinely issued press releases and held press

ORDER - 3

conferences with analysts that painted a generically rosy picture of the company's health and future prospects.  No mention was made of the loss of the Middle School names list, either favorably or negatively.

The Plaintiff alleges that the following statements were misleading:

• February 8, 2007 press release issued by Ambassadors Group announcing its financial results for the fourth quarter and year end of 2006.  Ct. Rec. 45, ¶ 62.  February 9, 2007 conference call between Ambassadors Group, analysts, and investors.  Ct. Rec.45,¶ 63.  April 23, 2007 press release issued by Ambassadors Group announcing its financial results for the first quarter of 2007.  Ct. Rec. 45, ¶ 64.  Plaintiff alleges that these three statements were materially misleading due to their positive description of the financial state of Ambassadors and concurrent failure to disclose the loss of List Company A and replacement with List Company B.  Ct. Rec. 45, ¶ 65.

• The April 23, 2007 press release included the following statement: "[O]ur first quarter operating results include increased marketing and development spending as we prepare for and invest in 2008 programs."  Plaintiff alleges that this statement was materially misleading because Ambassadors failed to disclose that the increase in expenses was caused by the necessity of finding a replacement for List Company A and the hiring of a new marketing employee in connection thereto.  Ct. Rec. 45, ¶ 65.  A conference call conducted the next day, April 24, 2007, is alleged to have been materially misleading for the same reasons.  Ct. Rec. 45, ¶ 66.

• July 23, 2007 press release by Ambassadors announcing financial results for the second quarter of 2007.   Ct. Rec. 45, ¶ 68.

• July 24, 2007 conference call by Ambassadors Group with analysts and investors.  During this call, Mrs. Thomas stated: "Our second focus this time of year is our marketing campaigns for 2008.  We are in the process of launching these campaigns right now.  The campaigns are similar in timing and delivery as previous years." Ct. Rec. 45, ¶ 69.  Plaintiff alleges that these statements were materially false and misleading due to the 2008 marketing program being substantially dissimilar to that used previously.  Plaintiff

claims Ambassadors' failed to disclose: the loss of its ongoing Middle School mailing list; the use of a different mailing list;  that there was a substantial decrease in enrollment for 2008 programs;  Ambassadors' increases in marketing expenses were precipitated by the purchase of the new Middle School list and the hiring of another marketing employee; and, Ambassadors lack of a reasonable basis for making positive statements about its future prospects.  Ct. Rec. 45, ¶ 71.

    • October 22, 2007 press release by Ambassadors announcing financial results for the third quarter of 2007.  Ct. Rec. 45, ¶ 72.  October 23, 2007 conference call by Ambassadors with analysts and investors.  Ct. Rec. 45, ¶ 73.  Results discussed at this time were poor, and Ambassadors stock fell 44%.  Plaintiff alleges that Ambassadors' statements at this time regarding poor early indicators for 2008 were materially misleading because it knew as early as summer 2007 that response rates were poor, and had known in late 2006 that it had lost access to its key mailing list.  Ct. Rec. 45, ¶ 74.

    During a conference call on October 23, 2007, Mr. Thomas discussed factors that might have contributed to the decline in enrollment, such as the weak U.S. dollar, the worsening economy's effect on discretionary spending, and the unexpected under-performance of the mailing list purchased from List Company B.  Mr. Thomas explained that the mailing list was satisfactorily tested using the same methodology used to test other lists prior to use, but that its actual performance fell below expectations.

B.  Procedural History

    Lead Plaintiff Plumbers Union Local No. 12 ("Plumbers") filed the original Complaint in this matter on July 14, 2009.  Ct. Rec. 1.  On October 22, 2009, the court approved the substitution of IBEW Local 351 as Lead Plaintiff.  Ct. Rec. 29.  On January 7, 2010, Plumbers was re-appointed Lead Plaintiff.  Ct. Rec. 44. Plumbers filed its First Amended Complaint on January 11, 2010.  Ct. Rec. 45.  On February 11, 2010, Ambassadors and Mr. and Mrs. Thomas filed their Motion to Dismiss the First Amended Complaint.  Ct. Rec. 49.  Mr. Byrd also filed his Motion to Dismiss the First Amended Complaint on February 11, 2010.  Ct. Rec. 55.

II.  Standard of Review

When considering a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court considers the contents of the Complaint, and the allegations contained therein are accepted as true and construed in the light most favorable to the Plaintiff.  *Western Reserve Oil and Gas Co. v. New,* 765 F.2d 1428, 1430 (9th Cir. 1985).  Dismissal of the Complaint is improper unless it is certain that the plaintiff cannot prove any set of facts in support of the claim that would entitle the relief sought.  *Gibson v. United States,* 781 F.2d 1334, 1337 (9th Cir. 1986).  Motions to dismiss for failure to state a claim are viewed with disfavor.  *Gilligan v. Jamco Development Corp.,* 108 F.3d 246, 249 (9th Cir. 1997).

The Private Securities Litigation Reform Act ("PSLRA") governs this case.  The PSLRA sets forth a heightened pleading standard which requires plaintiffs to plead specific facts both establishing falsity and giving rise to a strong inference of scienter. 15 U.S.C. § 78u-4(b)(1)(B); *In re Silicon Graphics Inc. Secs. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999).

III.  Discussion

A.  Failure to State a Claim

The Defendants first argue that the Plaintiff has failed to allege the basic elements of a Section 10(b) claim, thereby necessitating dismissal for failure to state a claim upon which relief may be granted.  This argument is independent of alternative arguments related to the PSLRA's heightened pleading requirements.  Ct. Rec. 51, 12:13-16.  It is not necessary to evaluate the First Amended Complaint in any manner other than through the lens of the PSLRA's heightened pleading requirements.  A Complaint that is sufficient under the PSLRA's standards is necessarily sufficient under 12(b)(6) requirements.  Conversely, if the Complaint is not sufficient under the PSLRA's standards, sufficiency under 12(b)(6) does not save it from dismissal.  *New York City Employees' Retirement System v. Jobs,* 593 F.3d 1018, 1022 (9th Cir. 2010).

B.  Failure to State a Claim Under the PSLRA

Section 10(b) of the Securities Exchange Act of 1934 makes unlawful the "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance[.]" 15 U.S.C. § 78j(b).  SEC Rule 10b-5, which implements section 10(b), makes it unlawful "[t]o employ any device, scheme, or artifice to defraud." 17 C.F.R. § 240.10b-5(a).  Rule 10b-5 also declares it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id*. § 240.10b-5(b).  In a private securities fraud action, the plaintiff generally must prove five elements: (1) a material misrepresentation or omission of fact; (2) scienter; (3) a connection with the purchase or sale of a security; (4) transaction and loss causation; and (5) economic loss.  *Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 990 (9th Cir. 2009).  The PSLRA further requires a plaintiff to plead specific facts establishing falsity and a strong inference of scienter.

Whether a public statement is misleading, or whether adverse facts were adequately disclosed, is a mixed question to be decided by the trier of fact.  *Durning v. First Boston Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987); *In re Apollo Group Inc. Securities Litigation,* 509 F.Supp.2d 837, 842 (D.Ariz. 2007).  Only if the adequacy of the disclosure or the materiality of the statement is "so obvious that reasonable minds [could] not differ" are these issues "appropriately resolved as a matter of law." *Durning.* 815 F.3f at 1268.  Defendants contend that the First Amended Complaint fails to specifically plead facts under which a jury could determine that the Plaintiff is entitled to the relief sought.

Rule 10b-5 promulgates two theories under which a statement may be found to be misleading: the statement is facially false, or facts were omitted that rendered an otherwise true statement misleading.  A statement is misleading if it would give a reasonable investor an impression regarding a state of affairs that differs in a material way from one that actually exists.  *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  "No matter how detailed and accurate disclosure statements are,

there are likely to be additional details that could have been disclosed but were not." *Id.*
Rule 10b-5 contains no freestanding completeness requirement. *Id.*

*1. Facially False Statement*

On July 24, 2007, Mrs. Thomas stated: "Our second focus this time of year is our
marketing campaigns for 2008.  We are in the process of launching these campaigns right
now.  The campaigns are similar in timing and delivery as previous years" (hereinafter
"delivery statement").  Ct. Rec. 45, ¶ 69.  Plaintiff alleges that this statement was "simply
untrue" because the 2008 marketing campaign was not similar in delivery to previous
years, due to Ambassadors' loss of the Middle School mailing list provided by List
Company A.  Ct. Rec. 45, ¶ 71, Ct. Rec 61, 12:14.

Plaintiff argues that the loss and subsequent replacement of the Middle School
names list constituted a material event since mailing lists represented 90% of
Ambassadors' marketing leads, and the Middle School names list accounted for 45% of
Ambassadors' business.  Ct. Rec. 61, 11:26-12:2.   Ambassadors' statement that the 2008
marketing campaign would be similar in delivery to previous years arguably mislead
investors into believing an unchanged state of affairs existed.  The terminated
relationship with List Company A also forced Ambassadors to lower the minimum
average income level to which it mailed marketing materials (Ct. Rec. 45, ¶ 55), hire an
additional marketing employee (Ct. Rec. 45, ¶ 57), send a greater proportion of materials
to high school students who responded, on average, at a lower rate (Ct. Rec. 45, ¶ 55),
and lower the initial registration fee from $400 to $95 (Ct. Rec. 45, ¶ 60).

Plaintiff relies on *Kaplan v. Rose,* 49 F.3d 1363 (9th Cir. 1994).  In that case, a
medical systems company stated that the success rate of its product compared favorably
with competitors.  The success rate for the product in question was 18.5%, while the
competitor's success rate was 80%.  *Id.* at 1372.  The rate difference was sufficiently
significant to create a genuine issue of fact regarding the materiality and misleading
nature of the statement and preclude summary judgment in favor of the plaintiff
corporation.

The First Amended Complaint pleads sufficient specific facts that, when taken as true, create a genuine issue of material fact regarding whether the 2008 marketing campaign was not, in fact, similar in delivery to previous years' campaigns. The distinction between this statement and the "puffery" discussed in Sec. III.B.2, *post,* is the specific discussion of mailing of marketing materials. This discussion is more specific than the vague, general assertions regarding growth littered throughout Ambassadors' press releases and conference calls. Whether or not the delivery statement was materially misleading is not a question so obvious that reasonable minds cannot differ, *Durning, supra*, therefore it is not appropriately decided as a matter of law, but must be decided by a trier of fact. Accordingly, the Defendants' Motion to Dismiss is denied insofar as it relates to the July 24, 2007 statement of Mrs. Thomas regarding the delivery of 2008 marketing materials.

*2. Omission of a Material Fact*

The Plaintiff contends that the statements listed in Sec. III-A, *ante*, while not facially false, were rendered misleading due to Ambassadors' failure to disclose therewith the issues regarding the loss of the Middle School names mailing list from List Company A. Ct. Rec. 45, ¶ 65. Plaintiff argues that the generally positive statements, without disclosure of the loss of List Company A, are actionable as forward-looking statements. Ct. Rec. 61, 13:2-4. A forward looking statement is any statement regarding "(1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003). A forecast is actionably false if "there is no reasonable basis for the belief" or "the speaker is aware of undisclosed facts tending seriously to undermine the statements' accuracy." *Provenz v. Miller*, 102 F.3d 1478, 1487 (9th Cir.1996). Plaintiff argues that the loss of the Middle School names List "A" and its replacement with an inferior list, the lowering of the minimum average income level of mailing targets, and the increased marketing expenses in relation thereto

constituted undisclosed facts that seriously undermined the accuracy of Ambassadors'
generally positive statements.

The press releases  were general and vague, constituting "puffery." Puffery is an
intrinsic part of business and courts have held that such statements are not actionable.
*See In re Syntex Corp. Securities Litigation*, 855 F.Supp. 1086, 1095 (N.D.Cal. 1994),
*aff'd*, 95 F.3d 922 ("These statements are nothing more than 'puffing,' which reasonable
investors know do not guarantee future success.")

Unlike the delivery statement of Mrs. Thomas, these releases were general and
vague.  The PSLRA sought to end the pleading of "fraud by hindsight."  *In re Silicon
Graphics,* 183 F.3d at 988.  Permitting this action to proceed based only on Ambassadors'
general statements would be to allow both the pleading of fraud by hindsight and
contribute to precedent allowing suits based on vague, general statements that are not
fraudulent, even were fraud ultimately proven in this instance.  Investment gains and
losses are risks inherent in a capitalist system, and these risks are tacitly accepted when
any group or individual chooses to invest.  Contracts are won and lost.  Such events are
intrinsic to the cyclical nature of business.  Where Mrs. Thomas' delivery statement
affirmatively mislead, the general statements engaged in puffery and did not necessitate
disclosure of every event that occurred in the course of Ambassadors' daily operations.
Those general statements, in and of themselves, would not survive the Motion To
Dismiss.

C.  Scienter

The PSLRA requires that a complaint plead facts sufficient to support a strong
inference of scienter as to each defendant.  *In re Silicon Graphics,* 183 F.3d at 985; 15
U.S.C. § 78u-4(b)(2).  Defendants contend that the Plaintiff has not alleged that any
Defendant was aware of the names list issue (Ct. Rec. 51, Sec. III-B) and that Defendants'
stock sales are not sufficiently unusual to raise a strong inference of scienter (Ct. Rec. 51,
Sec. III-D).

A misleading statement of existing fact, which the Plaintiff alleges is satisfied by

Mrs. Thomas' delivery statement, must have been made with actual knowledge or deliberate recklessness regarding the misleading nature of the statement. *No. 84 Employer-Teamsters,* 320 F.3d at 931. Ambassadors' press releases, which the Plaintiff argues are forward looking statements, must have been made with actual knowledge of facts undermining the projection. *Id.*

Plaintiff alleges facts supporting a strong inference of scienter. Statements of confidential witnesses ("CW") allege that Mr. and Mrs. Thomas were present at organizational meetings in which the mailing campaign was planned in April 2007. Ct. Rec. 45, ¶ 58. Plaintiff alleges that "Ambassadors' senior executives certainly would have been informed of the devastating loss of the middle school names list." Ct. Rec. 61, 20:16-17. Courts have held that some events are so integral to the operations of a company that knowledge thereof cannot be denied by senior executives. *See Berson v. Applied Signal Technology,* 527 F.3d 982, 987 (9th Cir. 2008); *No. 84 Employer Teamster Joint Council*, 320 F.3d at 943 n. 21.

When representing the sole basis for scienter, the "core operations" inference is insufficient. *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784-85 (9th Cir. 2008). The core operations inference may be sufficient, however, when made in conjunction with detailed allegations concerning management's exposure to factual information within the company. In *In re Daou Systems, Inc*., 411 F.3d 1006, 1022-23 (9th Cir. 2005), plaintiffs relied in part on "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database" to support a strong inference of scienter. Plaintiff alleges that Defendants had access to Ambassadors' Student Program database which provided detailed information regarding students targeted for the marketing campaign. Ct. Rec. 45, ¶ 52.

The Plaintiff further relies on the stock purchases of Mr. and Mrs. Thomas to support a strong inference of scienter. Ct. Rec. 61, 24-26. Evidence of stock sales is not

dispositive of, but may support, inferences of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 325 (2007). Mr. Thomas sold 85,000 shares, for a profit of slightly more than $3 million, between June and August of 2007, after the undisclosed loss of the very important Middle School List "A." Ct. Rec. 45, ¶ 80. Mrs. Thomas sold 34,000 shares, for a profit of slightly more than $1 million, in May 2007, again after the loss of Middle School List "A." *Id.* CW 1 and CW 2 allege that Ambassadors employees were told not to exercise their stock options during this period. Ct. Rec. 45, ¶ 54, 56. In its quarterly report filed with the SEC dated November 5, 2009, Ambassadors disclosed that it is under SEC investigation with respect to trading in its securities, and its belief that this investigation is related to activities during the class period. Ct. Rec. 64, Ex. C, 13.

The entirety of the First Amended Complaint, which must be considered in lieu of individual allegations, gives rise to a strong inference of scienter. *Tellabs,* 551 U.S. at 325. Ambassadors is a small corporation. There is no reasonable argument that the Defendants were not aware of the mailing list issue. The core operations inference in this case is a strong one, as the Middle School names list accounted for 45% of the marketing leads for Ambassadors. This inference is strengthened by the allegations of the confidential witnesses, the SEC investigation, and the stock sales.

D.  Defendant Chadwick Byrd's Motion to Dismiss

Mr. Byrd filed a separate Motion to Dismiss that sets forth three arguments justifying dismissal of all claims against him in the First Amended Complaint. First, Mr. Byrd argues that because no statement made by him personally was false or misleading, he cannot be held liable for a violation of Section 10-b. Second, Mr. Byrd contends that the First Amended Complaint fails to plead facts supporting a strong inference of scienter. Third, Mr. Byrd contends the Plaintiff's Section 20(a) control person theory of liability fails due to the lack of a predicate Section 10-b violation by any person to whom he qualifies as a control person. Ct. Rec. 57, 2:7-26.

The July 24, 2007 statement and omission by Mrs. Thomas is the basis of the

action.  Since Mr. Byrd did not personally make a statement constituting a primary

violation of Section 10-b, he may only be primarily liable thereunder if the statement of

Mrs. Thomas is attributed to him.  Mr. Byrd argues that primary violations of Section

10-b must be alleged based on statements made by each defendant, not a general group of

corporate officers.  Ct. Rec. 57, 3:20-24.

The group pleading doctrine is "a presumption that the allegedly false and

misleading 'group published information' complained of is the collective action of

officers and directors."  *In re GlenFed, Inc. Sec. Litigation,* 60 F.3d 591, 593 (9th Cir.

1995).  The Ninth Circuit has yet to decide if this doctrine survived enactment of the

PSLRA, but some district courts have declined to apply it in circumstances somewhat

similar to those currently before the court.  *See In re Dothill Systems Corp. Securities

Litigation,* 2009 WL 734296, *12 (S.D.Cal. 2009).  Even under the group pleading

doctrine, however, oral statements such as the "delivery" statement cannot be attributed to

a group.  *See In re Impac Mortgage Holdings, Inc. Securities Litigation*, 554 F.Supp.2d

1083, 1092 (C.D.Cal. 2008); *Allison v. Brooktree Corp.*, 999 F.Supp. 1342, 1350 (S.D.

Cal. 1998).  The Southern District of Ohio, however, declined to dismiss a complaint in

which the executives who participated on a conference call were identified, but the

speaker of an individual statement was not.  *In re SmarTalk Teleservices, Inc. Securities

Litigation*, 124 F.Supp.2d 527 (S.D. Ohio 2000).  It reasoned that "a high ranking

company official cannot sit quietly at a conference with analysts, knowing that another

official is making false statements and hope to escape liability for those statements.  If

nothing else, the former official is at fault for a material omission in failing to correct

such statements in that context."  *Id.* at 543.  The Fifth Circuit favorably discussed *In re

SmarTalk* and reached the same conclusion in attributing primary liability under Section

10-b to a defendant who knowingly failed to correct a false statement uttered by a co-

defendant.  *Barrie v. Intervoice-Brite, Inc.,* 409 F.3d 653, 656 (5th Cir. 2005).  The

Southern District of New York, the venue in which many securities class actions are filed

due to its close proximity to Wall Street, followed *Barrie* and *SmarTalk* when it held that

individual defendants are liable for others' statements made during conference calls in which they participated.  *Freudenberg v. E\*Trade Financial Corporation*, 2010 WL 1904314, \*21-22 (S.D.N.Y. 2010).

This court finds persuasive the reasoning in the line of cases of *SmarTalk, Barrie,* and *Freudenberg*.  There is imperfection in these holdings, as modern conference calls may involve transience on and off the call on the part of its participants.  Corporate officers, however, may not stand idly by as investors and analysts, upon whose recommendations other investors rely, are mislead.  Corporate executiveship often carries with it substantial financial remuneration, but with such remuneration comes duties and obligations to the company and its stockholders that must not be ignored, as the economic catastrophes befalling our country in the past two years have harshly illustrated.  Affirmative steps are required to prevent fraud, or to even merely clarify when a statement veers into a dangerous grey area.  Mr. Byrd may not cloak himself in his silence and avoid liability for the misleading statements of his co-defendants made to public stock analysts during a conference call at which he was present.   Mr. Byrd's first argument thus fails.

Mr. Byrd's second and third arguments also fail.  For the reasons discussed in Sec. III-C, *supra*, the core operations inference and Mr. Byrd's position as an executive in a close corporation form a sufficient basis for a strong inference of scienter.  Mr. Byrd has not disputed that he is a control person for the purposes of joint and several liability pursuant to Sec. 20(a), only arguing that a necessary predicate violation of Sec. 10-b did not occur as a matter of law.  The Plaintiff has pled sufficient facts supporting its allegation that a primary violation did occur, and Mr. Byrd is potentially liable for the delivery statement, both primarily, *SmarTalk, Barrie, Freudenberg,* and secondarily, as a control person pursuant to Sec. 20(a).

E.  Mr. Thomas' Liability

Though not addressed in the pleadings, the court notes that its ruling in Sec. III-B-

2, *supra*, leaves Mr. Thomas in the same position as Mr. Byrd, that of a conference call participant when the "delivery" statement and omission occurred.  For the reasons stated in Sec. III-D, *supra*, Mr. Thomas, like Mr. Byrd, is potentially liable for these actions, both primarily, *SmarTalk, Barrie, Freudenberg,* and secondarily, as a control person pursuant to Sec. 20(a).    **IT IS HEREBY ORDERED**:

    1.  The Defendants' Motion to Dismiss the First Amended Complaint (Ct. Rec. 49) is **DENIED.**

    2.  Mr. Byrd's Motion to Dismiss the First Amended Complaint (Ct. Rec. 55) is **DENIED**.

The clerk is hereby directed to enter this Order and furnish copies to counsel.

**DATED** this 2nd day of June, 2010.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE

ORDER - 15